Nelson *vs.* Hagerstown Bank, *et al.* Hagerstown Bank, *et al.*, *vs.* Nelson.

(Decided 16th May, 1867.)

---

CHARLOTTE J. NELSON *vs.* THE HAGERSTOWN BANK AND OTHERS. THE HAGERSTOWN BANK AND OTHERS *vs.* CHARLOTTE J. NELSON.

*Conversion of Realty into Personalty—Equitable Mortgages—Power of a Court of Equity to Reform Mistakes—Registry Acts—Affidavit by Mortgagee—Laches and Lapse of Time—Parol Agreement—A Defectively Executed and Unrecorded Mortgage recognized as Evidence under Seal, of Indebtedness—Liability of Trustee for Interest.*

The proceeds of a sale of real estate, sold under a decree of a Court of Equity, do not become personal property until the sale has been ratified.

The rule that Equity regards as done that which was agreed to be done, will authorize an agreement to execute a mortgage to be treated in Equity as a mortgage, provided it can be done consistently with the rights and equities of others, and in a reasonable time after the alleged promise was made. But a Court of Equity will not enforce a specific performance of a contract for a mortgage on real estate, unless the contract is plain, explicit, and in writing; for where there is doubt created in the mind of the Court no relief will be granted.

Where, in a conveyance designed to secure a debt, there is a mistake in the description of the interest intended to be conveyed, a Court of Equity will, upon a proper application, made within a reasonable time, and not to operate to the prejudice of subsequent creditors, interpose to reform the deed, in order to carry out the true intention of the grantor.

The Registry Acts of this State were designed to avoid abuses and deceits by mortgages and pretended titles, and for the protection of creditors and purchasers, and should be construed so as to effect that end.

Nelson *vs.* Hagerstown Bank, *et al.* Hagerstown Bank, *et al., vs.* Nelson.

The Act of 1846, ch. 271, requiring a mortgagee to make an affidavit that the consideration set forth in the mortgage was true and *bona fide*, was designed not merely for the prevention of fraud, but for the benefit of creditors, who may claim against such an instrument as void in law under the Act, no matter how the question of actual fraud may stand. And Courts of justice will not permit laws made for the prevention of fraud and the protection of purchasers and creditors, to be avoided by the substitution of a parol promise, or a written communication, that the party in possession of the property, and the ostensible owner of it, will, at some indefinite period of time, execute a mortgage on it.

What will be considered laches and lapse of time will depend upon the facts and circumstances of each particular case. It is not merely in analogy to the Statute of Limitations that a Court of Equity refuses to lend its aid to stale demands; there must be conscience, good faith, and reasonable diligence, to call into action the powers of the Court; and where these are wanting, the Court is passive and does nothing. Laches and neglect are always discountenanced.

When the specific execution of a parol agreement cannot be decreed, in consequence of the uncertainty in its terms or of the Statute of Frauds being relied on, the Court will, if there be no remedy at law, or if it be uncertain or embarrassed or under circumstances of special equity, decree compensation to the extent of the purchase money paid.

A defectively executed and unrecorded paper, intended as a mortgage to secure money loaned, while insufficient, as such, to entitle the grantee to claim a specific lien thereunder, is evidence of an indebtedness under the hand and seal of the grantor, and a bar to the Statute of Limitations, the claim of the grantee having been filed before the expiration of twelve years from the date of said intended mortgage.

A trustee who derives interest from the employment of the trust fund is chargeable therewith.

CROSS APPEALS from the Circuit Court for Washington County.

The facts of the case are so fully set forth in the opinion of the Court, that no further statement of the same is deemed necessary.

The cause was argued before BOWIE, C. J., BARTOL, and CRAIN, J.

Nelson *vs.* Hagerstown Bank, *et al.*   Hagerstown Bank, *et al., vs.* Nelson.

*Richard H. Alvey* and *William Schley*, for Miss Nelson, argued:

1. That the written evidence, supported by the circumstances of the case, manifest with sufficient certainty an agreement on the part of Thomas Buchanan, deceased, to secure the money borrowed of his aunt by a mortgage on his interest in his grandfather's real estate; and that it was upon the faith of obtaining such security that the money was advanced. Such being the case, it is supposed to be established that an agreement in writing to give a mortgage, or a mortgage defectively executed, or any imperfect attempt to create a mortgage, or to appropriate specific property to the discharge of a particular debt, will create a mortgage in equity, or a specific lien, which will have precedence of subsequent judgment creditors, notwithstanding the Registry laws. *Alexander et al. vs. Ghiselin et al.*, 5 *Gill*, 138; *Tiernan vs. Poor*, 1 *Gill & John.*, 216; *Brundige et al. vs. Poor et ux.*, 2 *Gill & John.*, 1; *Taylor vs. Wheeler*, 2 *Vernon*, 564; 1 *White & Tudor's Lead. Cas. in Eq.*, side p. 449, top 467, *Amer.* note to *Russel vs. Russell*, and cases there cited. As between the parties to the agreement every intendment is to be made in favor of the party to be secured, unless everything appears to the contrary. *Repp et al. vs. Repp et al.*, 12 *Gill & John.*, 341.

Where such agreement, or defective or incomplete conveyance exists, it creates an equitable as contradistinguished from a legal mortgage, and on mortgages of the former class entitle the mortgagee to claim specific performance, and the execution of a legal mortgage. "In the meantime, they stand on the same footing as mortgages of an equity, and entitle the mortgagee to a receiver of the rents." *Adam's Doct. of Eq.*, side p. 123; *Ogden vs. Ogden*, 4 *Ohio N. S.*, 182.

If, therefore, upon the facts of the case, a specific performance would be decreed as against Thomas Buchanan,

were he living, the party is entitled to the relief sought in this proceeding.

2. The imperfect and inaccurately drawn conveyance of the 27th of February, 1851, while it mistakes the manner of the devolution of the interest attempted to be conveyed, (for James A. Buchanan had died a considerable time before Judge Buchanan made his will,) it shows plainly to a casual reader, with a knowledge of the facts disclosed in the record, what particular interest or property was in the contemplation of the writer ; and as it is all a matter of intent without regard to form, if the Court be satisfied that it was the interest of Thomas Buchanan in his grandfather's estate, acquired under the will of the latter, that the former attempted to convey, then the claimant is entitled to the same benefit of the instrument as if it had been accurate and formal.

And if it were necessary to secure the benefit of the contract to the claimant, that the instrument should be reformed, the Court would, upon being satisfied of the mistake, correct the instrument, so that full effect might be given to it. *Hodgkinson vs. Wyatt,* 9 *Beav.,* 566 ; 1 *White and Tudor's L. Cas. in Eq.,* side *p.* 445, *in Eng. Note to Russel vs. Russel* ; *Hunt vs. Rousmanier's Adm'rs,* 8 *Wheat,* 174 ; *Moale vs. Buchanan et al.,* 11 *Gill & John.,* 314 ; *Baynard vs. Woolley,* 20 *Beavan,* 583.

And although the entire consideration of $3,200, recited in the instrument, had not been actually advanced at the time it was executed, yet it was perfectly competent to take such an assignment as security, as well for advances that had been already made, as for any to be subsequently made. 1 *White and Tudor's Lead. Cas. in Eq.,* side *p.* 445, *in Note; Shirras and others vs. Craig & Mitchel,* 7 *Cranch,* 34 ; 4 *Kent's Com.,* 175.

3. The question is not whether the debtor changed his mind, or refused to execute the formal legal mortgage, after obtaining the money ; but *whether the money was*

*advanced upon the faith or reasonable supposition, superin-
duced by the acts and agreement of the party, that it was to
be secured by a mortgage of the particular interest;* for "if
a man has power to charge certain lands, and agrees to
charge them, in equity, he has *actually charged them,* and
a Court of Equity will execute the charge." *Rolleston vs.
Morton,* 1 *Drury & Warren,* 195; *Whitworth vs. Gaugain,*
3 *Hare,* 416.

And if the money were so advanced, "the party asking
relief would be entitled to a specific lien, and the Court
would consider the debtor as a trustee for the creditor, of
the property on which the security was agreed to be
given." *Hunt vs. Rousmanier's Admr.,* 1 *Pet.,* 1, 16.

This case, while it is much stronger in its facts
and its equity, resembles, in its general aspect and pre-
sentation, that of Stuart, referred to in *Burn vs. Burn,* 3
*Ves.,* 573, and which was expressly sanctioned by the
Court in *Alexander vs. Ghiselin,* 5 *Gill,* 185. It is there-
fore insisted that the appellant, Miss Nelson, is entitled
to priority of payment of her claim.

As to the trustee's accountability for interest up to the
present time.

The money had been in his hands since the ratification
of the distributions of the proceeds of. Judge Buchanan's
estate.—1st acct. ratified 1st January, 1855; 2d, 27th
April, 1855; 3d, 26th March, 1856; and 4th, 10th May,
1857. The bill was not filed until 24th of April, 1857.
Mr. Roman combined the characters of trustee and coun-
sel, and had the proceedings under his charge; and
having made himself a defendant to the proceedings, he
did not put in his answer to the bill until March 14th,
1859, nearly two years from filing the bill. Upon the
filing of the auditor's accounts, this trustee, as counsel for
himself and others, filed exceptions thereto, but never
brought them to the attention of the Court, or set them
down for hearing, or attempted in any manner to move

for their disposition, but allowed them to hang and operate delay.

When Miss Nelson filed her petition, setting up her claim, she propounded certain interrogatories to the trustee, in order to discover how and where the fund had been kept and used, and an order was passed requiring him to answer the interrogatories, and to bring the money into Court.

The trustee filed an answer containing much that is impertinent, but which is intended as an excuse for his conduct, but admits that he had deposited the fund *in bank to his own credit,* and *on his own individual account,* and had upon several occasions drawn out and used the fund for his own private purposes, and he supposed "it was, in effect, a profit to him of the lawful interest thereon during the periods, and on the amount so used;" and he demurred, and plainly defied the power of the Court, and stated that he was "unwilling by such means to sanction *the discourteous and unprofessional and unusual conduct* of the solicitor who filed said petition, *in seeking to hold a trustee responsible for interest on a trust fund under such circumstances, a course without precedent in this Court, &c.*"

And he did not bring in the money, and still holds it, notwithstanding the order. Upon this state of facts we insist—

1. It was the duty of the trustee, under the circumstances of the case, to have taken the money into Court, and procured an order authorising an investment pending the proceedings instituted by him; or to have so invested the fund as to make it yield interest, instead of keeping it in his own hands, using it in his business, and to sustain his credit in bank; and his failing so to invest the fund, amounts to negligence, and renders him liable for interest. *Gwynn vs. Dorsey, Adm'r of Howard,* 4 *Gill & John.,* 453 ; *Thomas, Adm'x of Bradley, vs. The Frederick*

Nelson *vs.* Hagerstown Bank, *et al.*  Hagerstown Bank, *et al., vs.* Nelson.

*County School,* 9 *Gill & John.,* 115 ; *Hill on Trust., side p.* 376 ; *Diffenderffer vs. Winder,* 3 *Gill & John.,* 311 ; *Comegys vs. State, use of Dyckes,* 10 *Gill & John.,* 186 ; *Chase vs. Lockerman,* 11 *Gill & John.,* 185 ; *Glenn's Ex'rs vs. Cockey and Wife,* 16 *Md. Rep.,* 446 ; *Yundt's Appeal,* 13 *Penn. St. Rep.,* 575 ; *Mickle, Adm'r of Campbell, vs. Cross, Adm'r of Neilson,* 10 *Md. Rep.,* 352.

2. The placing the money in bank to his own individual credit, and mixing it with his own money in one general account, and treating and using the whole as his own, renders the trustee liable for interest. His having kept the money, when not otherwise employed by him, in bank to his own credit, he is to be considered as *using* it, and therefore accountable for interest. *Rocke vs. Hart,* 11 *Ves.,* 61 ; *Treves vs. Townshend,* 1 *Bro. Ch. Rep.,* 385 ; *Massey vs. Banner,* 1 *Jac. & Walk.,* 241 ; *Schieffelin vs. Stewart,* 1 *John. Ch. Rep.,* 620, 626.

*James S. Franklin* and *Oliver Miller* for the Hagerstown Bank and others.

The rule that Equity regards as done that which was agreed to be done, it is admitted will, in certain cases, authorize an agreement to execute a mortgage, to be treated in equity as a mortgage. Again, it may be admitted that, though the contract must be in writing, it need not be drawn up in any particular form, nor be comprised in a single document ; it may be gathered from any writings of the party, or even from his correspondence, but it must be *all plainly* made out in *all its terms* from the writings, and no *verbal* testimony is admissible to supply any defects or omissions in the written evidence. *Browne on Statute of Frauds,* 359 ; 1 *Greenl. Ev., sec.* 268, and cases there cited in notes. See *Alexander vs. Ghiselin,* 5 *Gill,* 181, 182. The absolute necessity that the contract should be *clearly expressed and plainly* made out, is illustrated by reference

to the cases where such contracts have been enforced. *Read vs. Adm'r of Simmons*, 2 *Dessa. Eq.*, 552 ; *Menude vs. Delaire*, 2 *Dessa. Eq.*, 564 ; *Delaire, Ex. Polony & Read vs. Keenan and others*, 3 *Dessa. Eq.*, 74 ; *Welsh vs. Usher and others*, 2 *Hill's Ch. Rep.*, 166 ; *Dow et al. vs. Ker et al., Speer's Eq. Rep.*, 417 ; *In the matter of Howe*, 1 *Paige Ch. Rep.*, 125 ; *Bank of Muskingum vs. Carpenter's Admr's et al.*, 7 *Ohio*, 67 ; *Lake vs. Dodd et al.*, 10 *Ohio*, 415.   So too in the English cases :—*Burgh vs. Francis*, 1 *Eq. Cases Abr.*, 320 ; *Taylor vs. Wheeler*, 2 *Vernon*, 564 ; *Sir Simeon Stuart's Case, cited in Burn vs. Burn*, 3 *Vesey*, 575 ; *Whitworth vs. Guagain*, 3 *Hare*, 416.   So also in the Maryland cases :—*Brundige et al. vs. Poor et ux.*, 2 *G. & J.*, 1 ; *Tiernan vs. Poor et ux. et al.*, 1 *G. & J.*, 216 ; *Woods et al. vs. Fulton & Starck*, 4 *H. & J.*, 329 ; *Thomas's Adm'rs vs. Von Kapff's Ex'rs*, 6 *G. & J.*, 372 ; *Aldridge & Higdon vs. Weems & Hall*, 2 *G. & J.*, 36.

Indeed so rigidly has this requirement, that the contract must be *clearly expressed and plainly made out from the writings alone,* been adhered to, that it is confidently asserted no case can be found in which a Court of Equity has ever undertaken to enforce an agreement, or apply the maxim in question, where there was *any doubt* upon these points.   In examining the proof, therefore, in this case, we must keep steadily in view these rules :

1st. That the contract must be established by written evidence, and the whole of it, in all its terms, must be made out from the writings, without the aid of verbal testimony.

2d. That the writings must clearly and explicitly state the contract, otherwise a Court of Equity cannot lend its aid to enforce it, or apply the maxim, that equity will regard as done that which was agreed to be done.

With these rules for our guidance, let us examine the proof in this case.   The agreement, which we must find, is a plain and clearly expressed written contract, on the

part of Thomas Buchanan, to mortgage to his aunt, Miss Nelson, his interest in his grandfather's real estate, to secure her the sum of $3,200, loaned and advanced to him by her, at sundry times between October, 1850, and July, 1851. This is the contract set up in her petition.

1st. The first document relied on is the unacknowledged and unrecorded deed of the 27th of February, 1851. This paper was filed as an exhibit with the answer of Mrs. Dugan and her husband, and they say this deed was executed and delivered to Miss Nelson by Thomas Buchanan. They must, if it were ever so delivered, have received it from Miss Nelson, and it throws suspicion over the whole matter that she did not also deliver to them at the same time the correspondence, so much relied on now. Miss Nelson, in stating fully and formally the character and history of her claim, says that her nephew having, some time about 1850, engaged in a business enterprise in Hagerstown requiring a considerable amount of ready money, and being destitute of any means of his own, applied to her in Philadelphia for the loan of her money, or as much as she could raise and spare, to be used in and applied to his business demands; that then the correspondence ensued, which evidences the contract, and she loaned him the money between October, 1850, and July, 1851, and to carry out this contract and assignment to secure her, he, in the *first place,* executed this deed, which, being inaccurately drawn and not acknowledged, was not put on record. The plain inference from all this is that the money was loaned in view of the foundry business in Hagerstown, and this deed executed to secure it. Now there is not a particle of evidence that Thomas Buchanan ever contemplated entering into such a business at the time this deed was executed, or even that he was then in Hagerstown. He did not purchase the foundry till the latter part of June, 1851. On the contrary, he was at the West, in *Milwaukee,* as late as 30*th of January,* 1851, when

he drew a draft on his aunt for $1,014.23, at *thirty days*, the proceeds of which, it is fair to presume from his letters, he waited there to receive ; and this would leave him at the West *after* the date of this deed. The first letter from Hagerstown is dated the 7th of May, 1851, in which he says nothing of the purchase of the foundry, but mentions that he did not go to Western Virginia, as he had contemplated when he last wrote. It is impossible, therefore, that the $1,014 could have been loaned in view of any business in Hagerstown, or that the deed could have been executed to secure any money theretofore or thereafter to be advanced in view of any such business.

But what is this deed, and what does it convey ? It conveys " all my share of, and interest into, any and all property, of what kind or nature soever, which was given, devised, and bequeathed to *my father, James A. Buchanan, M. D., late of Washington county, deceased, by and under the last will and testament of my grandfather,* Thomas Buchanan, late of Washington county aforesaid, deceased ; which said will and testament, bearing date the first day of April, A. D., 1837, duly registered in the proper office, in the county of Washington and State of Maryland, on the 19th day of April, 1847, to the intent that the said Charlotte Isabel Nelson shall my portion hereby take, of all and every the devises and bequests to *James A. Buchanan,* made by said will, as fully and amply as I myself might or could do, *as son and one of the heirs at law of the said James A. Buchanan, deceased."* If this deed had been duly acknowleged and recorded, it can scarcely be pretended the grantee could claim under it any property which had been devised *directly to the grantor* by his grandfather's will. Ejectment could not have been maintained on it for any such real estate. The misdescription is so particular and so obvious, that it is absolutely void as a conveyance of the interest in the real estate now in dispute. *Berry vs. Matthews & Chapman,* 13 *Md. Rep.,* 537.

But it is said there was a *mistake*, and that equity will reform the deed and execute it as reformed. It is admitted that upon *proper proof* of a *mistake in fact*, equity will reform a written instrument, but where the instrument is such as the parties designed it to be, equity will not aid a *mistake in law*. In the case of *Hunt vs. Rousmanier*, 8 *Wheat.*, 174, this point was left open, but upon further deliberation in the *same case*, in 1 *Peters*, 1, it was expressly decided that equity could afford no relief against a plain mistake of law, where the instrument was such in fact as the parties intended it should be.

Is there, then, any mistake in fact? Where relief is asked upon the ground of mistake or accident, there must be *clear*, *explicit*, and *conclusive proof* of the mistake, to justify the interference of a Court of Equity. *Katz vs. Moore et al.*, 13 *Md. Rep.*, 566; *Beall vs. Greenwade's Adm'rs*, 9 *Md. Rep.*, 185; *Ellinger et al. vs. Crowl and Wife*, 17 *Md. Rep.*, 361.

There is *no proof whatever* in the record of any mistake in this deed.

2d. Another paper—the *unexecuted* mortgage prepared by Mr. Clagett—is relied on. Mr. Clagett was examined twice, and proves that sometime in the year 1851 he, *at the request of Thomas Buchanan*, and as his attorney for that purpose, prepared this mortgage, conveying to Miss Nelson all said Thomas' interest and estate, as devisee and legatee under his grandfather's will; that it remained in witness's possession from the time it was written till he delivered it to Mr. Alvey, a short time before it was filed in this case; that he searched for it, at Mr. Alvey's request, and found it in his secretary; it was never called for or paid for by Thomas Buchanan.

This paper never having been executed by Thomas Buchanan, and not written by him, no *promise in writing* can be obtained from it. For all purposes of this case it might just as well never have been written. The

whole matter rests upon the proof of Mr. Clagett, and even if this had been much stronger than it is, and he had proved that he heard Thomas Buchanan *promise to execute to his aunt a mortgage of this very property*, it would only have amounted to a *parol promise* to mortgage real estate ; a contract which the Court of Appeals, in *Clabaugh and Landers 'vs. Byerly*, 7 *Gill*, 362, say a Court of Equity *has no jurisdiction* to enforce, and of which it *can take no notice*. Nor can this parol proof be used to supply any defects or omissions in the written evidence. 1 *Greenl. Ev., sec.* 268. This paper and Mr. Clagett's testimony must therefore be entirely dismissed from the case ; it cannot be *noticed* by the Court. *Roberts on Frauds,* 106 ; *Montacute vs. Maxwell,* 1 *Peere Wms.,* 619.

3d. Then can the contract be plainly and explicitly made out from the correspondence? . We think not. A careful examination of the letters does not disclose any promise on the part of Buchanan to mortgage to his aunt his interest in the Wooburn estate, nor does it show that he ever intended to execute such a mortgage to her. In the letter of the 8th of June, 1851, to his aunt, so far from promising a mortgage, he states objections to making one. In his letter dated the 10th of the same month, he speaks of his being obliged to raise twelve hundred dollars in ten days, to meet Mr. Jones' demand on account of the foundry, and that he could only do this by giving some one a mortgage on his interest in the Wooburn estate, and says "you will be obliged to risk some for me if I enter into the establishment, or rather if I am permanently to remain in it. The amount of your risk will be $1,200, till I am able to sell my engine and collect what moneys are due me in the West; it will then be diminished by as much as I may then pay. After that *your* risk will be for the balance, in case of my death within the next three years. Should I live for three years you will have nothing to risk." "You are the only one in this wide

world I can expect any assistance from of the nature I have requested of you. When sister becomes of age she will give you a mortgage on her interest in the Wooburn." And he twice begs for a speedy answer. This, so far from being a promise to mortgage, is an earnest appeal to an affectionate and confiding relative for aid, for a loan, on his word and promise of repayment. Why speak of a *risk* his aunt was to incur, if he had promised or intended to give a mortgage? And why promise that his sister should execute a mortgage? According to this letter there would have been no risk for the $3,200, and the $1,200 added, if he were to give a mortgage on property worth from $4,600 to $5,000. It was written two days after the letter to Smith, in which he had stated his objection to giving a mortgage. The *speedy answer* no doubt came, complying with this urgent request, for on the 16th he drew his draft for $1,764.65, which was paid on the 22d, and on the 25th for $20, to correct the error and make up the $1,784.65. On the 27th he mortgaged the foundry and all his interest in *his grandfather's estate* to Jones, to secure the unpaid purchase money on the foundry; on the 29th he writes to his sister, and on the 30th to Smith, in neither of which letters is there a word said about a mortgage. This ends the correspondence, and though he lived nearly three years thereafter, not a word is said by his aunt about a mortgage, and no attempt made by her to enforce this alleged contract.

Again, even if a promise to mortgage can be gathered from these letters, it is impossible to find *from them* (and we must find it from the written evidence alone) the *terms* of the contract. It is nowhere stated in them for *what sum* the mortgage was to be given, nor for what period the mortgage was to run. This want of certainty as to the terms of the contract is *fatal.* The identical contract set up in the petition must be proved; that is, a mortgage to secure the sum of $3,200; the Court can execute no

other. This contract cannot be made out from any or all of the letters in the record. On this point, and as to *certainty* in the terms of the contract, see *Roberts on Frauds*, 105, 106; *Clerk vs. Wright*, 1 *Atk.*, 12; *Abeel vs. Radcliff*, 13 *Johns.*, 300; *Blagden vs. Bradbear*, 12 *Vesey*, 466; *Rider & Trotter vs. Gray et al.*, 10 *Md. Rep.*, 282; *Carr and Wife et al. vs. Hobbs, Adm'r of Bell*, 11 *Md. Rep.*, 285; *Sanderson vs. Stockdale et al.*, 11 *Md. Rep.*, 563; *Browne on Statute of Frauds*, 354, 359.

But even if the appellant ever had an equity which she could enforce, she has lost it by limitations, *laches and lapse of time.* The language of Lord Camden, in *Smith vs. Clay, Ambler*, 645, has often been adopted by our courts: "A Court of Equity, which is never active in relief against conscience or *public convenience*, has always refused its aid to stale demands, where the party has slept upon his rights and acquiesced for a great length of time. Nothing can call forth this Court into activity but conscience, good faith, and *reasonable diligence.* Where these are wanting, the Court is passive and does nothing. *Laches and neglect* are always *discountenanced.*" *Story's Eq.*, sec. 1520, and cases cited in notes. In *Hanson and Wife et al. vs. Worthington et al.*, 12 *Md. Rep.*, 418, and *Glenn, Adm'r de bonis non of Lindenberger vs. Hebb's Adm'r et al.*, 17 *Md. Rep.*, 260, this Court has said, "what lapse of time and laches are sufficient to bar the rights of parties to recover on a claim *purely equitable* depends on the particular facts and *circumstances of each case.*"

In all the cases which have been cited, where such a contract as this has been sought to be enforced, the bills have been filed *recenti facto*. Here the party knew she had no mortgage, and is presumed to have known that as early as the 27th of June, 1851, her nephew had mortgaged this property to Jones; that he was ostensibly its owner, dealing with it as his own, and contracting debts on the faith of his ownership of it. Her equity was a

secret one, against the policy of the Registry Acts, which were made for the protection of creditors and purchasers, and to avoid abuses and deceits by mortgages and pretended titles: *Genl. Ins. Co. vs. United States Ins. Co.,* 10 *Md. Rep.,* 517 ; and yet, though he lived nearly *three* years thereafter, she made no demand for a mortgage, and no effort to enforce her claim by any proceeding, either at law or in equity, and did not set it up till more than five years after his death. In such a case the Court ought to apply the rule rigidly, and at least adopt by analogy, if not in obedience to the Statute of Limitations, the bar of three years. But, in a case very similar to this, the Court of Appeals held that a party had lost just such an equity as is set up in this case, by delaying to file his bill for a *year and five months.* See *Clabaugh and Landers vs. Byerly,* 7 *Gill,* 354, where the equity relied on by the subsequent mortgagee, was an agreement to execute a mortgage to him, as a *first lien,* which was known to and acquiesced in by the prior mortgagee, at the time the latter took his mortgage. This case is conclusive on the question of laches. See, also : *White vs. White,* 1 *Md. Ch. Dec.,* 53 ; *Hitch vs. Fenby,* 6 *Md. Rep.,* 218 ; *Hertle vs. McDonald,* 2 *Md. Ch. Dec.,* 128; *Chew vs. Farmers Bank of Maryland,* 2 *Md. Ch. Dec.,* 231 ; *Hughes vs. Jones,* 2 *Md. Ch. Dec.,* 289.

This appeal brings up the question, 1st, as to the propriety of ratifying the audit in so far as it allows Miss Nelson to come in as a general creditor, and participate in the distribution of this fund as against those who have pleaded limitations to her claim. In this view it must be assumed her equitable lien will not be sustained. Where creditors are claiming a common fund, each has the right to plead limitations to the claims of the others, and this plea, in cases where it applies, enures to the benefit of those pleading it. And limitations run against a claim down to the time of filing it. These principles have been

settled by so many decisions that it is useless to cite authorities in their support. As a simple contract creditor the claim of Miss Nelson was clearly barred by limitations. Limitations were relied on by these parties by way of exception to the auditor's report, as soon as the claim was made and allowed in the audit, and this was the proper way to do it. *Berry vs. Pierson,* 1 *Gill,* 234. There is absolutely nothing in the record to justify the statement in the appellant's brief, that Mr. Roman "never brought these exceptions to the attention of the Court, or set them down for hearing, or attempted in any manner to move for their disposition, but allowed them to hang and operate delay," or the other statement, that "upon these exceptions no order of Court was obtained, nor were they ever put down for hearing, or in any manner brought to the attention of the Court" by the exceptions. On the contrary, the record shows that the exceptions were filed in due time; that three audits were made, to the second and third of which, exceptions were filed by the complainants; that Miss Nelson's petition was then filed and the proof taken in support of and against her claim; that other accounts were then stated by the auditor, to which Miss Nelson filed exceptions, and then an order was passed by the Court *setting down for hearing "the several exceptions filed in this cause to the auditor's various reports and accounts."* Limitations were, therefore, properly interposed, properly brought to the attention of the Court, and regularly set down for hearing. And there was clear error in not allowing the plea to prevail in favor of the creditors who pleaded it. 2 *Story's Eq., sec.* 1520.

2d. As to the question of interest. The liability of a trustee to pay interest must be determined from the *character of the trust* and the circumstances attending its administration. *Comegys vs. State, use of Dyckes,* 10 *G. & J.,* 185. This was not a permanent trust, nor was the trustee bound to invest. Mr. Roman was simply trustee under a

decree in equity for the purpose of sale and distribution. The distributees were bound to protect their interests by applying for distribution and demanding payment and investment of the money, if the settlement of the trust was likely to be long delayed. The trustee's duty was discharged by paying the money as distributed by order of the Court, or bringing it into Court, to be disposed of under its direction. The prompt and faithful manner in which this large property was sold, the money collected and paid to the distributees, is amply disclosed in the record.

CRAIN, J., delivered the opinion of this Court.

The controversy in this case grows out of the conflicting claims of the creditors of Thomas Buchanan, late of Washington County, deceased. It appears from the record, that in June, 1851, Thomas Buchanan purchased the Hagerstown Foundry from James R. Jones, and on the 27th of that month mortgaged it, together with "all his interest in all the real estate" of his grandfather, the late Judge Thomas Buchanan, to Jones, to secure the payment of five thousand seven hundred dollars, with interest. His interest in his grandfather's real estate consisted of one twenty-fifth part thereof as devisee under his grandfather's will. It appears that he died about the 7th of March, 1854, leaving personal assets which were administered by his sister, Harriet Dugan, and Mr. George Schley, but which were totally insufficient to pay his debts. Judge Buchanan's real estate had been sold by J. Dixon Roman, as trustee, under a decree passed in October, 1853, but the sale had not been ratified before his death. His interest in that estate amounted to $3,678.12, which remained in the hands of the trustee, audited to Thomas Buchanan. On the 24th of April, 1857, the appellees, for themselves and all other creditors of said Thomas, treating this fund as real estate, filed a

bill against Mrs. Harriet Dugan and her husband, Mrs. Dugan being his sister and his only heir at law, and against Mrs. Dugan and Mr. George Schley, his administrators, and J. Dixon Roman, the trustee, asking that this money might be applied to the payment of their debts, alleging the insufficiency of the personal assets.

The claims of the creditors who filed, accrued between the 30th of November, 1853, and the 10th of January, 1854, as appeared by the exhibits filed with the bill, and amounted in the aggregate to a sum of money more than the amount in controversy. The answers of the administrators admitted the insufficiency of the assets of the personal estate of the intestate. to pay his debts. Roman admitted he had the fund as stated, and Dugan and his wife admitted that Mrs. Dugan was his only heir at law, that his estate was insolvent and totally insufficient to pay his debts, and believed that he was indebted to the complainants as stated, but they say they are advised that the said Thomas Buchanan in his lifetime being largely indebted to Miss Charlotte J. Nelson, and intending to secure her in her just debt, did, on the —— day of ——, execute and deliver to her a deed of all his interest in the real estate whereof his father, the late Judge Thomas Buchanan, died, seized and possessed, and although said deed was not recorded as required by the Acts of Assembly, they are advised that in a Court of Equity it will be regarded as an equitable deed, and entitled the said Charlotte J. Nelson to the benefit of the same, and made the deed an exhibit with their answer, which will be found in the record as a deed from Thomas Buchanan to Miss Nelson, dated February 27th, 1851. After these answers were filed the Judge of the Circuit Court, at March Term, 1859, of the Court, passed a decree referring the case to the Auditor to take proof, and state such accounts as the parties might desire to illustrate their claims. Under this reference the Auditor stated three

accounts, which were filed in this cause on the 19th of May, 1859. By the first account, the claim of Miss Nelson was rejected as a specific lien, but she was allowed to come in as a general creditor, receiving her proportion of the fund in controversy. On the 9th of June, 1859, the appellees, the complainants in the bill, filed their exceptions to the Auditor's report, upon the ground that Miss Nelson's claim was not proved, and full proof was demanded; and also upon the ground that it was completely barred by limitations 'which was plead and relied upon against the claim. Before the Court took any action on these exceptions, Miss Nelson, during the November Term, 1859, of the Court, filed her petition asking that her claim might be set up on the footing of an equitable mortgage, to be considered and treated as a preferred lien upon the fund, by reason of the conveyance relied on by Dugan and wife, in connection with certain letters written by Thomas Buchanan to her and others. After proof was taken to authenticate the letters and documents relied on, the case was set down for final hearing, and the claim of Miss Nelson was rejected as a preferred lien, but allowed as a general creditor by the Circuit Court of Washington County. From the decree of the Court Miss Nelson appealed, because she was not allowed a preference, and the Hagerstown Bank and other creditors appealed because she was allowed a distributive share of the fund. We have, therefore, to review the decree and determine whether Miss Nelson was entitled to have her claim allowed in either aspect.

We agree with the Circuit Court that the estate of Thomas Buchanan had not been converted from realty into personalty at the time of his death, as the sale of Roman, as trustee, had not been ratified.

The fund in controversy is, therefore, to be treated as assets from the sale of real estate, and distributed as such to his creditors. In this case we are asked specifically to

enforce, set up and sustain a secret agreement to execute a mortgage between a nephew and his aunt, and to give to the aunt, in virtue of that secret agreement, the entire fund now in controversy.   The rule that equity regards as done that which was agreed to be done, it is admitted will authorize an agreement to execute a mortgage to be treated in equity as a mortgage, provided it can be done consistently with the rights and equities of others, and in a reasonable time after the alleged promise was made. But a Court of Equity will not enforce a specific performance of a contract for a mortgage on real estate, unless the contract is plain, explicit, and in writing, for where there is doubt created on the mind of the Court, no relief will be granted.

Does the evidence in this case manifest with sufficient certainty an agreement on the part of Thomas Buchanan to secure the money advanced to him by his aunt by a mortgage of his interest in his grandfather's real estate? For the purpose of establishing such an agreement Miss Nelson has relied on certain papers and letters executed and written by Thomas Buchanan in his lifetime.   The first is a paper signed by him, dated the 27th of February, 1851, but not acknowledged and recorded, by which, for the consideration of $3,200, he conveyed to her "all his share of and interest into any and all property of what kind or nature soever, which was given, devised and bequeathed to his father, James A. Buchanan, late of Washington County, deceased, by and under the last will and testament of his grandfather, Judge Thomas Buchanan."   From an examination of that conveyance, in connection with the will of Judge Thomas Buchanan, and the fact that his father, James A. Buchanan, died years before his grandfather made the will, we must conclude he designed, at the time he signed this instrument, to transfer to his aunt the interest he had acquired in his grandfather's estate; we will not impute to him bad faith

and fraud in the description of the property, as a Court
of Equity never assumes fraud. We are of opinion that
he made a mistake in the manner of the devolution of the
interest attempted to be conveyed, and on an application
to a Court of Equity the deed would have been reformed
to carry out the intention of the party. No application
was ever made to reform the deed or make it valid and
operative, and from the subsequent correspondence of the
parties in reference to security for the money loaned or
about to be loaned, we may infer that this instrument,
thus defectively executed, was not regarded as sufficient
security by her and her legal adviser, yet she appears to
have retained and preserved it, and we suppose as evi-
dence of the indebtedness of her nephew to her, in which
character we shall have occasion to consider it in a subse-
quent part of this opinion. Another paper was intro-
duced as evidence, in connection with the letters, of a
promise or intention to mortgage, and that was an un-
executed mortgage, prepared, at his request, by Mr.
Clagett, sometime in the year 1851, by which he conveyed
all his interest in the property in controversy to Miss
Nelson, but this deed was never called for or paid for
by Thomas Buchanan, as the witness states, and was
delivered, many years after his death, to Miss Nelson's
counsel. As this mortgage was not written by Thomas
Buchanan, and was not seen by him, a Court of Equity
would not enforce such a contract, unless it was sustained
by other evidence than the mere parol proof of Mr.
Clagett, who says he was requested to draw it by Mr.
Buchanan, but it is contended by the learned counsel for
the appellant that the correspondence, taken in connection
with this mortgage, establishes the contract relied on and
sought to be enforced. All the letters in evidence to
prove the contract were written between the 24th of Octo-
ber, 1850, and 30th of June, 1851 ; they furnish the most
conclusive proof that the nephew wanted the use of the

aunt's money, was importunate to obtain it, and finally received from her three thousand two hundred dollars, to secure which a mortgage was contemplated to be executed, but the terms were not agreed upon, when he addressed to her, on the 16th of June, 1851, a most loving and earnest letter, suggesting strong reasons for not executing a mortgage, as it would be calculated to impair his credit, with assurances that her money would be safe, and indicating how it would be paid. Most of the money advanced to him was after this letter, and no subsequent letter is produced to her from him. From their mutual silence we may infer that she thought the investment perfectly safe without the mortgage. The counsel for the appellees insisted that all this evidence was not sufficient under the fourth section of the Statute of Frauds to establish a contract for a mortgage on real estate, whilst it was earnestly contended by the counsel for the appellant that it was too late to object to the character and sufficiency of the evidence, where no exceptions to it had been taken by the appellees in the Court below. The view which we have taken of this case dispenses with the necessity of determining these questions, for assuming the promise to execute a mortgage on real estate to be proved as required by the Statute of Frauds and the terms of the contract established, against whom are we called on to set it up and enforce it? Not against Thomas Buchanan, he is not alive to give an explanation of his conduct and vindicate himself from the imputation of bad faith or gross negligence; not against his heirs at law, for his only heir says she has no interest in it, his estate being insolvent; not against creditors existing at the time of the promise; but we are asked to set it up against subsequent creditors, who, during the lifetime of Thomas Buchanan, and up to the time of his decease, so far as they had any possible means of judging, considered him the real and *bona fide* owner of this very property, for Mr. Roman swears that

he promised to give them a mortgage on the same property. As an authority to justify us in enforcing this specific lien, we have been referred to the case of *Alexander vs. Ghiselin*, 5 *Gill*, 138. In that case the contract sought to be enforced was of a recent date, and the equity of the strongest character, appealing to the conscience of the Court, Mrs. Ghiselin having released her valid mortgage on real estate in favor of Mr. Glenn, on the assurance by Mr. Ghiselin that he would secure her money by a mortgage on his negro property. It was a struggle for priority between Mr. Alexander and the existing creditors of Ghiselin, and Mr. Alexander having used more diligence obtained a promise from Mr. Ghiselin to give the mortgages to secure the debts, and which this Court decreed to be specifically performed. But this is a case of subsequent creditors, for whose benefit the Registry laws were enacted, and comes within the principles of the decision of this Court in the case of the *General Insurance Company vs. The United States Insurance Company*, 10 *Md. Rep.*, 517. Speaking of the Registry laws, the learned Judge says "they were designed to avoid abuses and deceits by mortgages, and pretended titles, and for the protection of creditors and purchasers, and should be construed so as to effect that end."

In addition to the Registry laws the Legislature, by the Act of 1846, chapter 271, required the mortgagee to attach to his mortgage, at the time of its execution, an affidavit that the consideration mentioned was true and *bona fide*, designed, no doubt, to protect the public from fraudulent transfers in the nature of mortgages and secret sales. This Act was subsequent to the contract of Alexander and Ghiselin, and has received a judicial interpretation in the case of *Cockey vs. Milne's lessee*, 16 *Md. Rep.*, 200 ; in delivering the opinion of the Court Justice Bartol says : "In our opinion it was designed not merely for the prevention of fraud, but for the benefit of credi-

74    MARYLAND REPORTS.

Nelson *vs.* Hagerstown Bank, *et al.*   Hagerstown Bank, *et al.*, *vs.* Nelson.

tors, who may claim against such an instrument as void in law under the Act, however the question of actual fraud may stand." After this judicial exposition of the law as applicable to mortgages really executed, acknowledged and recorded, without the affidavit being attached of the *bona fides* of the consideration, we think it our duty to declare that Courts of justice will not permit these laws, made for the prevention of fraud and the protection of purchasers and creditors, to be avoided by the substitution of a parol promise, or a written communication, that the party in possession of the property, and the ostensible owner of it, will at some indefinite period of time execute a mortgage on it. To sanction such an evasion of the law would be highly injurious to the public interest, in derogation of the rights of creditors, and well calculated to destroy confidence among commercial men. But the counsel for the appellees insist that if the appellant ever had an equity which she could enforce, she has lost it by limitations, laches, and lapse of time. What will be considered laches and lapse of time will depend upon the facts and circumstances of each particular case. In *McKnight vs. Taylor*, 1 *Howard*, 168, the Supreme Court said "that it is not merely in analogy to the Statute of Limitations that a Court of Equity refuses to lend its aid to stale demands; there must be conscience, good faith, and reasonable diligence to call into action the powers of the Court. When these are wanting the Court is passive and does nothing; laches and neglect are always discontinued. See *Story's Equity*, 1520, *Hanson and Wife et al. vs. Worthington et al.*, 12 *Md. Rep.*, 418; *Glenn, Adm'r de bonis non of Lindenberger, vs. Hebb's Adm'r et al.*, 17 *Md. Rep.*, 260. What, then, are the facts and peculiar circumstances of this case? Miss Nelson knew she had no mortgage, and is presumed to have known it as early as the 27th of June, 1851; at that time her nephew had mortgaged the property to Jones; that

he was ostensibly the owner of the same, dealing with it as his own and contracting debts on the faith of his ownership of it, and though he lived nearly three years thereafter she made no demand for a mortgage, and no effort to enforce her claim by any proceedings, either at law or in equity.  We find no evidence in the record of the payment of any interest to her on account of the debt, or any demand on her part for the payment of the debt and interest.  After his decease, there is no evidence that she took any action to have her claim established as a debt entitled to preference and priority, and this Court, in the case of *Clabaugh and Landers vs. Byerly*, 7 *Gill*, 358, held that a party had lost his equity by delaying to file his bill in one year and five months.  See also *White vs. White*, 1 *Md. Ch. Dec.*, 53 ; *Hertle vs. McDonald*, 2 *Md. Ch. Dec.*, 128 ; *Chew vs. Farmers' Bank of Maryland*, 2 *Md. Ch. Dec.*, 231 ; *Hughes vs. Jones*, 2 *Md. Ch. Dec.*, 289.  Miss Nelson has not attempted to account for or excuse her delay.  As she has slept upon her rights and not used reasonable diligence to enforce them, the subsequent creditors have very properly relied on laches and lapse of time to defeat her secret equity.

Our next duty is to review the appeal taken by the Hagerstown Bank and other creditors against allowing Miss Nelson a share of the fund in controversy as a general creditor.  Miss Nelson advanced to her nephew three thousand two hundred dollars ; to that amount she is a creditor, entiled to a *pro rata* share of the assets, unless her claim is barred by the Statute of Limitations.  The Circuit Court allowed it, notwithstanding the plea, and we approve of the decision.  The instrument executed by Thomas Buchanan on the 27th of February, 1851, we have said would have been referred on application to a Court of Equity to carry out the *bona fide* intention of the assignor and made valid and operative to the assignee, provided the application had been made in a reasonable

time, and not to operate to the prejudice of subsequent creditors. We have said that we thought it inconsistent with the rights of subsequent creditors to decree a specific performance of the contract set up by Miss Nelson, but we are of opinion she ought to be considered a creditor to the amount of her advances made on the faith of the promise of her nephew and the instrument defectively executed, being of opinion that the circumstances will justify this species of relief under the principle recognized in 1 *White & Tudor's Leading Cases in Equity*, 527, where it is said, " When the specific execution of a parol agreement cannot be decreed, in consequence of the uncertainty in the terms, or of the statute being relied on, the Court will, if there is no remedy at law, or *it is uncertain* or embarassed, or *under circumstances of special equity,* decree compensation to the extent of the purchase money paid." See the cases there cited, and also *King's Heirs and others vs. Thompson and Wife,* 9 *Peter's S. C. Rep.*, 218.

We consider and recognize this defectively executed instrument as evidence of an indebtedness under the hand and seal of Thomas Buchanan to his aunt, and as the assignment and transfer proved inoperative, and she received nothing by virtue of it, she has for the amount of money advanced a *bona fide* and subsisting debt against the estate of Thomas Buchanan, and as her claim was filed before the expiration of twelve years she is not affected by the Statute of Limitations. On the appeal of the Hagerstown Bank and other creditors, we affirm the decree of the Circuit Court. We concur with the Circuit Judge, that Mr. Roman, the trustee, under all the facts and circumstances, is only answerable for the amount of interest received by him. We will sign a decree affirming the decree of the Circuit Court of Washington County on both appeals. The costs to be equally divided and paid by the appellant and appellees, and the cause

remanded, to be settled in conformity to the views expressed in this opinion.

*Decree affirmed and cause remanded.*

(Decided 17th May, 1867.)