*Edward Andre Bodeau v. State of Maryland*, No. 1365, September Term 2019
Opinion by Kehoe, J.


**PETITION FOR WRIT OF ERROR CORAM NOBIS — SCOPE**

A petition for a writ of error coram nobis is an equitable action by which the petitioner can challenge a conviction based on constitutional, jurisdictional, or fundamental grounds in order to escape the collateral consequences of an allegedly wrongful conviction after having discharged the sentence for that conviction.


**CORAM NOBIS — LACHES**

Because a coram nobis proceeding is equitable in nature, the doctrine of laches may be asserted as a defense. If the court concludes that the petitioner has unreasonably delayed in bringing the petition, and the delay has prejudiced the non-moving party, then the court may deny relief. Because laches is an affirmative defense, the party asserting it must prove both unreasonable delay and prejudice by a preponderance of the evidence.


**CORAM NOBIS — LACHES — DELAY AND UNREASONABLE DELAY**

Passage of time by itself does not constitute laches. A party asserting laches as a defense must demonstrate that the delay was unreasonable. The first step in determining when delay becomes unreasonable is to identify when the petitioner's claim became ripe, that is, when (i) the petitioner knew or should have known of the trial error, and (ii) a judicial remedy existed to rectify the error.


**CORAM NOBIS — CHALLENGE TO A CONVICTION BASED UPON AN INSTRUCTION THAT THE JURY WAS THE JUDGE OF THE LAW AS WELL AS THE FACTS**

In Edward Bodeau's 1979 trial on a charge of daytime burglary, the court told the jurors that its instructions were "advisory" and "not binding." Bodeau did not object to this instruction. He filed an appeal and later a petition for post-conviction relief, both of which were unsuccessful. In neither of these proceedings did he challenge the jury instructions.

In his coram nobis petition, Bodeau asserted that the jury as judge of the law instructions rendered his conviction constitutionally invalid. In the context of this case, such a claim became ripe only after: (1) the Court of Appeals held that, at least as to "bedrock characteristics" of the American notion of a fair trial, such an instruction was unconstitutional (*Montgomery v. State*, 292 Md. 84, 91 (1981); (2) the Court of Appeals held that a coram nobis petition could address errors of law as well as errors of fact (*Skok v. State*, 361 Md. 52, 67 (2000); and (3) the Court of Appeals held that such a claim could

be asserted in a coram nobis action even if there was no objection at trial (*Unger v. State*, 427 Md. 383, 391 (2012).

Bodeau's claim became ripe at some time after the opinion of the Court of Appeals in *Unger* was filed. The forty-odd years between the time of Bodeau's conviction and the filing of *Unger* was delay. In the context of the appellate arguments in this case, the unreasonable delay calendar began to run at some point during the seven years that passed after *Unger* was filed and before Bodeau filed his coram nobis petition.

**CORAM NOBIS — LACHES — DELAY AND PREJUDICE**

In the present case, the State demonstrated that its ability to retry Bodeau on the 1971 charges was prejudiced by the passage of time. But the State failed to show that any of this prejudice occurred after the date that the *Unger* opinion was filed. Additionally, the State failed to show that it had made any effort to locate its most important witness, a co-defendant who testified against Bodeau. The circuit court therefore erred when it denied the petition on the basis of laches.

Circuit Court for Montgomery County
Case No. 11896C

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1365

September Term, 2019

_____

EDWARD ANDRE BODEAU

v.

STATE OF MARYLAND

_____

Kehoe,
Leahy,
Adkins, Sally D.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: October 1, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

**Contents**

Introduction

Background

Analysis

    A. The State's laches defense

        1. The writ of error coram nobis

        2. The laches defense

        3. The standard of review

        4. The challenged laches conclusions

            a. Unreasonable delay

            b. Prejudice to the State

        5. Bodeau's add-on arguments

    B. Whether to reach the merits of Bodeau's petition

    C. The State's add-on argument

Conclusion

## Introduction

Almost five decades after his 1971 conviction for daytime burglary, appellant Edward Bodeau sought to vacate the conviction by filing a petition for a writ of error coram nobis in the Circuit Court for Montgomery County. He asserted that the daytime-burglary conviction was constitutionally infirm, obtained after the trial court explained to the jury that its instructions on applicable legal principles were "advisory only." Bodeau also alleged that even though he had long since served his sentence for the 1971 conviction, he was suffering collateral consequences: The conviction had been used as a predicate offense for the mandatory life-without-parole sentence that he has been serving since he was convicted of armed robbery in 1989.

After a hearing, the circuit court denied Bodeau's coram nobis petition. The court's decision was not based on the petition's merits. Instead, the court ruled that coram nobis relief was barred by the equitable doctrine of laches—that Bodeau had unreasonably delayed in bringing his challenge to the advisory-only instructions, prejudicing the State's ability to reprosecute Bodeau for the daytime burglary should a new trial be awarded.

Bodeau's appeal asks us to decide whether the circuit court erred in denying his coram nobis petition on laches grounds. In concluding that the court did err, we add a footnote to the "tortured history" of advisory-only instructions in Maryland. *State v. Adams-Bey*, 449 Md. 690, 695 (2016). We address the extent to which a petitioner in Bodeau's situation can be said to have unreasonably delayed in challenging his conviction before the Court of Appeals held in *Unger v. State*, 427 Md. 383 (2012), that a failure to have objected to advisory-only instructions in a pre-1981 criminal trial would not amount to a waiver of the issue. We will hold that Bodeau's failure to file a petition for a writ of error coram nobis was not unreasonable until, at the earliest, *Unger* was filed. It was only then that the Court of Appeals held that a failure to have objected to advisory-only instructions in a pre-1981 criminal trial did not amount to a waiver of the issue. This was critical for Bodeau because his 1971 trial counsel had not objected to the advisory only instruction. We will reverse the circuit court's judgment and remand the case for further proceedings.

## Background

*Bodeau's life sentence without parole*

In August 1971, a Montgomery County jury tried Bodeau on charges of daytime burglary and theft of property valued at $100 or more. At the time, daytime burglary (or housebreaking) was considered a crime of violence in Maryland.[1] Before sending the jury to deliberate, the trial court told the jurors that, under Maryland's constitution, they were "the sole judges of the law" and that, accordingly, its instructions were "advisory only" and "not binding." The court then instructed the jury on several legal principles, including the applicable burden of proof and the elements required to meet that burden for each of the offenses charged. Bodeau did not object to any of these instructions.

The jury convicted Bodeau on both counts, and the court sentenced him to concurrent seven-year terms of incarceration for each offense. Bodeau unsuccessfully appealed his convictions to this Court, and the Court of Appeals denied his petition for a writ of certiorari. Bodeau's subsequent petition for post-conviction relief was also denied. None

---

[1] Daytime burglary was considered a "crime of violence" at the time of Bodeau's 1989 sentencing. *See* Md. Code (1957, repl. vol. 1992), art. 27, § 643B(b) (defining "crime of violence" to include "daytime housebreaking"). In 1994, the General Assembly declassified daytime burglary as a crime of violence, but this change applied only prospectively to those sentenced after the statute was amended. *See* 1994 Md. Laws ch. 712 (amending § 643B by "deleting burglary and daytime housebreaking from the list of offenses that constitute crimes of violence for the purpose of certain mandatory minimum sentences," but also noting that the change "shall apply prospectively only to defendants who are sentenced after the effective date of this Act").

of Bodeau's contentions in either proceeding were based on the trial court's advisory-only instructions.

Eighteen years later, in November 1989, Bodeau faced another Montgomery County jury. This time, he was convicted of armed robbery. The prosecution sought a sentence of life imprisonment without the possibility of parole. This sentence was mandated by a four-strikes statute, Md. Code (1957, repl. vol. 1992), art. 27, § 643B(b),[2] which then provided:

> Any person who has served three separate terms of confinement in a correctional institution as a result of three separate convictions of any crime of violence shall be sentenced, on being convicted a fourth time of a crime of violence, to life imprisonment without the possibility of parole. Regardless of any other law to the contrary, the provisions of this section are mandatory.

At the time of his 1989 sentencing, the State asserted that Bodeau had been convicted of seven at least arguably predicate offenses for the purposes of § 643B(b).[3] There were

---

[2] The current version of the Maryland Code contains a substantially similar four-strikes law. *See* Md. Code, § 14-101(b)(1) of the Criminal Law Article ("Except as provided in subsection (f) of this section, on conviction for a fourth time of a crime of violence, a person who has served three separate terms of confinement in a correctional facility as a result of three separate convictions of any crime of violence shall be sentenced to life imprisonment without the possibility of parole."); *id.* § 14-101(b)(2) ("Notwithstanding any other law, the provisions of this subsection are mandatory.").

The current version of the statute also provides that, except for certain registered sex offenders, a person given a mandatory life sentence for crimes of violence "may petition for and be granted parole" if the person is at least sixty years old and has served at least fifteen years of the life sentence imposed. *Id.* § 14-101(f).

[3] His other convictions included two convictions for burglary (September 7, 1973, in Fairfax County, Virginia); a conviction for breaking and entering (January 31, 1974, in Alexandria, Virginia); a conviction for armed bank robbery (March 26, 1976, in the U.S. District Court for the Eastern District of Virginia); a conviction for robbery (August 26, 1976, in Fairfax County, Virginia); and a conviction for armed robbery and use of a handgun (December 15, 1976, in Montgomery County, Maryland).

two issues before the sentencing court, neither of which appears to have been fully resolved. The first was the degree to which Bodeau's federal and Virginia convictions could be treated as predicate offenses in light of differences between the elements of the offenses as established by the laws of those jurisdictions, and the elements of the offenses that were then considered "crimes of violence" for purposes of Art. 27, § 643B(b). The second was whether Bodeau had actually served separate terms of confinement for each predicate conviction. Ultimately, the sentencing court concluded that there were at least three predicate convictions (one being the 1971 daytime burglary conviction), and that Bodeau had served separate terms for each of them. On this basis, Bodeau received a life sentence without the possibility of parole.

*Bodeau's petition for a writ of error coram nobis*

Almost thirty years into his life sentence, on January 25, 2019, Bodeau filed a petition for a writ of error coram nobis in the Circuit Court for Montgomery County seeking to invalidate his 1971 daytime-burglary conviction. Bodeau contended that the conviction was constitutionally infirm because the trial judge had given the jury improper "advisory only" instructions. *See Stevenson v. State*, 289 Md. 167, 180 (1980) (explaining that, under Article 23 of the Maryland Declaration of Rights, the jury "is the final arbiter of disputes as to the substantive law of the crime, as well as the legal effect of the evidence," but that "all other aspects of law . . . are beyond the jury's pale, and that the judge's comments on these matters are binding upon that body"); *Montgomery v. State*, 292 Md. 84, 91 (1981) (holding, in light of *Stevenson*, that the trial court erred in instructing the jury that its instructions on the law were "advisory" and that the jury "could pay no attention" to them).

- 5 -

The instructional error, Bodeau contended, was structural and therefore not subject to harmless-error analysis, *State v. Waine*, 444 Md. 692, 705 (2015); was preserved despite his failure to object, *Unger v. State*, 427 Md. 383, 391 (2012); and, at least in the context of post-conviction relief, was a "constitutional infirmity . . . of the sort that will always invalidate the conviction," *State v. Adams-Bey*, 449 Md. 690, 708 (2016) (cleaned up).

Bodeau claimed he was entitled to coram nobis relief because, despite having fully served his sentence for the daytime-burglary conviction, he continued to suffer collateral consequences. As noted above, the 1971 conviction was used by the State to justify the mandatory life-without-parole sentence he received for his 1989 armed robbery conviction. Without the 1971 conviction, Bodeau asserted, he would not have been subject to the four-strikes statute at his 1989 sentencing for armed robbery and instead would have faced a maximum punishment of twenty years in prison without the possibility of parole.

In its answer to Bodeau's petition, the State did not contest the propriety of the advisory-only instructions given at the 1971 daytime-burglary trial. Nevertheless, the State argued three reasons why Bodeau's coram nobis petition should be denied. First, said the State, Bodeau would lose on the merits: He could not establish that he was "suddenly" facing "significant collateral consequences" as a result of the 1971 conviction. His enhanced life-without-parole sentence was a "foreseeable and predictable criminal punishment." Second, the State contended that even without the 1971 conviction for daytime burglary, "the State would still be able to establish that other convictions could serve as the predicate for the enhanced sentence." Third, the State asserted that, even if Bodeau could make out a prima facie case for coram nobis relief, relief was barred by the

equitable doctrine of laches. According to the State, Bodeau had unreasonably delayed in bringing his challenge to the advisory-only instructions, and this delay had impeded the State's ability to reprosecute him for the daytime burglary charge should a new trial be awarded.[4]

The circuit court held a two-day hearing on Bodeau's petition in May 2019. The parties elaborated on the arguments made in their filings, focusing principally on the laches defense raised by the State. Just as they do in this appeal, the parties disputed when Bodeau began to "delay" in asserting his rights (as early as 1971 or as late as 2012) and whether that delay (as long as forty-eight years or as short as seven years) was "unreasonable." The parties also disputed the degree to which any unreasonable delay by Bodeau had prejudiced the State's ability to reprosecute him should a new trial be awarded.

Several facts relevant to the prejudice question were established at this hearing through proffers by the State that were not challenged by Bodeau:

1. Two civilian witnesses were called at Bodeau's daytime-burglary trial: the homeowner–victim and a neighbor–witness. At the time of the May 2019 hearing, the homeowner–victim was ninety-four years old, still living at the same address but with no memory of the events surrounding the burglary. The neighbor–witness died in 2003.

2. Bodeau's co-defendant testified against him at trial. The State did not address the testifying co-defendant's availability at the May 2019 hearing before the circuit court.

---

[4] In passing, the State made an additional argument in its answer. Because the court file for Bodeau's 1971 trial had been destroyed, the State said, Bodeau "could not meet his burden of refuting the presumption of regularity attendant to his conviction much less of establishing the error he claimed." The State does not make this argument on appeal.

3. The detective who had handled the case and testified at Bodeau's 1971 trial had retired and—at the time of the hearing—was living in Rehobeth Beach, Delaware. The State's attempts to reach the officer by email were unsuccessful. The State had not subpoenaed the officer to see what he recalled of the case.

4. The original court file for the case was destroyed in 2006. The records were shredded according to standard records-retention protocol. The docket entries from the case were still available to the State, however.

5. Neither the State's Attorney's office nor the investigating police department still had a file on the case. All physical evidence that would have been stored with these files was also unavailable. There was no testimony or proffer as to when these records were rendered unavailable.

6. A transcript from the 1971 trial exists.[5]

On August 13, 2019, on the basis of the parties' arguments and the facts established at the hearing, the circuit court denied Bodeau's coram nobis petition with a written opinion and order. The court concluded that the relief Bodeau sought was barred by the doctrine of laches:

> First, [Bodeau] unnecessarily waited seven years from the *Unger* [*v. State*, 427 Md. 383 (2012),] decision to file his Petition for Writ of Error *Coram Nobis* . . . . [T]his is an unreasonable delay. The fact that [Bodeau] would

---

[5] The State observes on appeal—but, so far as we can tell, did not argue to the circuit court—that the trial transcript is "copied sideways and practically illegible." According to the State's brief, "it [would be] reasonable to infer that the chance of unearthing a legible version of the transcript decreased with every passing year." We believe that whether such an inference is reasonable is initially a matter for the circuit court. With that said, we point out that the State's premise may not be correct.

Part of the transcript submitted to the circuit court at the coram nobis hearing was copied sideways. But the record transmitted to us by the Circuit Court for Montgomery County Clerk's Office also contains what appears to be a full-sized photocopy of the original typed transcript of Bodeau's trial. It was certainly not photocopied sideways. Whether either transcript could fairly be characterized as "practically illegible" is not before us.

have been entitled to a new trial under *Unger* was made very clear in 2012 when the Court of Appeals handed down [its] ruling. [Bodeau] knew or should have known that this ruling would have impacted his circumstances when the *Unger* decision was published in 2012. Second, the State met [its] preponderance of the evidence burden with compelling evidence that one of its key witnesses in this prosecution is deceased and another is incapacitated. Without these key witnesses, the State is most certainly put in a "less favorable position" to reprosecute [Bodeau]. Third, just like in *Jones* [*v. State*, 445 Md. 324 (2015),] the State would be unfairly prejudiced if they would have to rely on the transcripts of the original trial to reprosecute [Bodeau]. Lastly, the State provided evidence that both the original court and state files for this case were destroyed years ago. This, too, would greatly prejudice the State because important information that it relied on for trial [is] no longer available for the State to reprosecute [Bodeau].

(Cleaned up.)

Bodeau timely appealed the denial of his coram nobis petition to this Court.

## Analysis

### A. The State's laches defense

In his appeal, Bodeau contends that the circuit court erred in concluding that the doctrine of laches barred his coram nobis petition. For several reasons, he says, the defense does not apply under the facts of this case.

First, Bodeau maintains that any calculation of delay in filing for coram nobis relief must begin after the Court of Appeals' decision in *Unger v. State*, 427 Md. 383 (2012). Until *Unger* was decided, Bodeau contends, any attempt by him to seek coram nobis relief would have been futile because his failure to object to the advisory-only instructions at his 1971 trial would have amounted to a waiver of the issue. It was only after *Unger* was decided, Bodeau argues, that his claim to coram nobis relief became "ripe." Measured from the time of the *Unger* decision, Bodeau says, his delay in seeking coram nobis relief could

not be considered "unreasonable." Because the litigants involved in *Unger* and its progeny were seeking post-conviction relief, Bodeau says he could have reasonably concluded that those decisions would not have applied to his case, "even if he had read the *Unger* decision on the day it came out."[6]

Second, Bodeau argues that even assuming he delayed unreasonably in filing his coram nobis petition, the State failed to establish that it was prejudiced by this delay. Although the 2003 death of the neighbor–witness and the fading memory of the ninety-four-year-old homeowner–victim would impede the State's ability to retry Bodeau for the daytime burglary, these events could not fairly be attributed to his unreasonable delay in seeking coram nobis relief. The neighbor–witness died before *Unger* was decided, and the State presented no evidence suggesting the homeowner–victim's memory diminished between 2012 and the date Bodeau filed his coram nobis petition. The State also did not establish the unavailability of two other critical witnesses: the co-defendant who testified against Bodeau and the detective, since retired, who had handled the case. Even without these witnesses, Bodeau argues, the State has trial transcripts that could be used as a substitute for live witness testimony. Additionally, says Bodeau, the State "did not pinpoint what 'important information' was lost" when the original court and prosecution files for the case were destroyed.

---

[6] At oral argument, Bodeau's counsel also asserted that it took the Office of the Public Defender some time to identify potential coram nobis claimants who, after *Unger*, could make unpreserved challenges to advisory-only instructions given at their jury trials. We will not address the merits of this contention for the reasons explained in footnote 15 of this opinion.

Third, as we understand his argument, Bodeau suggests that the circuit court's prejudice conclusions were erroneous because the State could not establish a "compelling interest" in retrying him to ensure that his 1989 life-without-parole sentence for armed robbery remained intact. Specifically, he says, the State "did not confirm that it would try . . . Bodeau again if his 1971 convictions were reversed" and "did not argue why it still had a compelling interest in keeping . . . Bodeau, who is 66 years old, behind bars for the rest of his life."

Finally, apart from his unreasonable-delay and prejudice arguments, Bodeau suggests that "the merits of [his] coram nobis petition also strongly weigh against applying the doctrine of laches." He emphasizes that the instructional error alleged was structural—not subject to harmless-error analysis—and "of the sort that will always invalidate the conviction," *State v. Adams-Bey*, 449 Md. 690, 708 (2016)—at least in post-conviction proceedings. If Bodeau were still serving his sentence for daytime burglary, he would undoubtedly be entitled to a new trial through post-conviction-relief proceedings. Fairness, Bodeau maintains, requires that Bodeau receive the same relief in the coram nobis context.

For its part, the State argues that the circuit court correctly determined that laches barred coram nobis relief. If it is assumed that the Court of Appeals' decision in *Unger* marks the beginning of Bodeau's delay in challenging the advisory-only instructions, the State contends, then that seven-year delay was unreasonable. This is because "Bodeau advances no reason for the . . . delay, although even under his logic, the day *Unger* was

- 11 -

decided, he had incentive to make the claim he advances now."[7] The State says it was prejudiced by this delay for *most* of the reasons noted by the circuit court but concedes that "if the length of delay is measured from the 2012 *Unger* decision, the 2003 death of . . . a witness to the burglary . . . should not be attributed to Bodeau for the purposes of determining prejudice to the State."

The State is not satisfied, however, that Bodeau's delay in making his challenge to the advisory-only instructions actually began with the 2012 decision in *Unger*. Instead, it argues that the correct starting point for measuring delay was the Court of Appeals' decision in *Stevenson v. State*, 289 Md. 167 (1980), for it was in that case, the State says, the Court of Appeals first held that "instructions that did not clearly tell the jury that the court's instructions on the law were binding were inconsistent with Article 23 of the Maryland Constitution." If not in 1980, the State argues, then Bodeau's delay began in 2000 when a federal appellate court held that an advisory-only instruction similar to the instruction given at Bodeau's 1971 trial violated constitutional due process. *See Jenkins v. Hutchinson*, 221 F.3d 679 (4th Cir. 2000). According to the State, this put Bodeau "on notice . . . of his potential cause of action to challenge the 1971 conviction." A determination that either of these cases marked the starting point for the calculation of Bodeau's delay "would shear Bodeau's arguments concerning prejudice of force." This is because, the State notes, the neighbor–witness did not die until 2003, the court file for the

---

[7] As we note below, it is the party asserting the laches defense who bears the burden of proving, by a preponderance of the evidence, that the delay in making a claim was unreasonable and that this unreasonable delay was prejudicial.

- 12 -

case was not destroyed until 2006, and it would be "reasonable to infer that [the homeowner–victim's] memory was better several decades ago than it is today."

Finally, the State takes issue with Bodeau's suggestion that, to establish prejudice, it needed to show some "compelling interest" in reprosecuting him that would outweigh his interest in challenging the concededly unconstitutional advisory-only instructions. "[I]n evaluating the prejudice that may give rise to a successful defense of laches," says the State, "there simply needs to be a showing that the party asserting the defense . . . would be at a disadvantage in correcting the alleged error." The State argues that a laches defense does not fail, rendering "old claims . . . actionable," simply because a reprosecution "is not worth the effort." Whether the State actually plans to retry Bodeau, were his petition granted, "should not enter into the calculus of prejudice." Even if some balancing of interests were required, the State asserts that it has a "strong interest in ensuring that convictions are legitimate," "an interest in enforcing its laws," and "an interest in maintaining finality of convictions that were valid when entered, at least when the State can make the factual showing necessary for laches."

Although we do not adopt wholesale the reasoning of either party, we agree with Bodeau that the circuit court erred in concluding that the laches defense applied in this case.

### 1. The writ of error coram nobis

A common-law writ of error coram nobis is an equitable action by which a petitioner may escape the collateral consequences of an allegedly wrongful conviction after having discharged the sentence for that conviction. *Moguel v. State*, 184 Md. App. 465, 471–72

(2009); *Ruby v. State*, 353 Md. 100, 106 (1999); *see also Holmes v. State*, 401 Md. 429, 475 (2007) (Raker, J., dissenting) (explaining that, like a habeas corpus proceeding or a proceeding under Maryland's Post Conviction Procedure Act, the writ is used to collaterally challenge a criminal judgment of conviction). It is a "civil matter procedurally independent of the underlying judgment being contested." *Ruby*, 353 Md. at 107.[8]

As the Court of Appeals recently summarized the state of the law, a convicted petitioner is entitled to coram nobis relief only if:

1. the petitioner challenges a conviction based on constitutional, jurisdictional, or fundamental grounds, whether factual or legal;

2. the petitioner rebuts the presumption of regularity that attaches to the criminal case;

3. the petitioner faces significant collateral consequences from the conviction;

4. the issue as to the alleged error has not been waived or finally litigated in a prior proceeding, absent intervening changes in the applicable law; and

5. the petitioner is not entitled to another statutory or common law remedy (for example, the petitioner cannot be incarcerated in a State prison or on parole or probation, as the petitioner likely could then petition for post-conviction relief).

*Jones v. State*, 445 Md. 324, 338 (2015) (cleaned up and formatting altered). Even when a petitioner meets these prerequisites for coram nobis relief, a writ is appropriately issued only if there are "circumstances compelling such action to achieve justice." *Coleman v. State*, 219 Md. App. 339, 353–54 (2014).

---

[8] The procedural rules for writ of error coram nobis actions are set out in Md. Rules 15-1201 to -1207.

The scope of the issues that could traditionally be raised in a coram nobis petition was relatively narrow. The writ could be used to attack only convictions that resulted from certain "errors of fact" not litigated at trial but nonetheless were "material to the validity and regularity of the proceedings." *Skok v. State*, 361 Md. 52, 67 (2000) (quoting *Madison v. State*, 205 Md. 425, 432 (1954)). In 2000, the Court of Appeals expanded the scope of coram nobis relief in Maryland to reach errors of law as well as errors of fact, provided the legal errors are "of a constitutional or fundamental nature." *Id.* at 77. This expansion came with an important preservation caveat: The rules of "waiver and final litigation of an issue," applicable in actions brought under Maryland's Post Conviction Procedure Act, constrain the right to seek coram nobis relief. *Skok*, 361 Md. at 79.

Generally, the writ is "allowed without limitation of time." *Madison*, 205 Md. at 432. But because the ability to grant coram nobis relief "arises out of the court's equity jurisdiction," *Moguel*, 184 Md. App. at 473, the time-conscious equitable defense of laches applies to coram nobis petitions, *Jones*, 445 Md. at 343 ("[W]e unequivocally hold that the doctrine of laches may, as an affirmative defense in a coram nobis action, bar an individual's ability to seek coram nobis relief."); *see also Moguel*, 184 Md. App. at 471 ("We hold that the doctrine of laches is a defense to a petition for writ of error coram nobis filed for the purpose of challenging a criminal conviction.").

### 2. The laches defense

The doctrine of laches is an affirmative equitable defense against "stale" claims, "based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 585

- 15 -

(2014) (quoting *Ross v. State Board of Elections*, 387 Md. 649 668 (2005)). Courts have long required "conscience, good faith, and *reasonable diligence*" of those who appeal to their equitable powers. *Nelson v. Hagerstown Bank*, 27 Md. 51, 64 (1867) (emphasis in original) (quoting 2 Joseph Story, *Commentaries on Equity Jurisprudence as Administered in England and America* 734 n.1 (Isaac Fletcher Redfield ed., 9th ed. 1866)). Courts sitting in equity may refuse their aid in cases "where the party has slept upon his rights[] and acquiesced for a great length of time." *Id.*

The laches defense applies where (1) an "unreasonable delay in the assertion of one party's rights" (2) "results in prejudice to the opposing party." *Jones v. State*, 445 Md. 324, 339 (2015) (cleaned up); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667 (2014) (describing laches as "*unreasonable*, *prejudicial* delay in commencing suit" (emphasis added)). As laches is an affirmative defense, the party that asserts it must prove the defense by a preponderance of the evidence. *Id.* at 339 (citing *Lopez v. State*, 205 Md. App. 141, 175 (2012)).

The applicability of the laches defense is not determined by reference to any "inflexible rule." *State Center*, 438 Md. at 590 (quoting *Parker v. Board of Election Supervisors*, 230 Md. 126, 130 (1962)). Instead, what amounts to laches—a term derived from "the old French word for laxness or negligence," *Buxton v. Buxton*, 363 Md. 634, 645 (2001)—turns on the totality of the circumstances presented by each case. *Jones*, 445 Md. at 339. "The passage of time, alone, does not constitute laches but is simply one of the many circumstances from which a determination of what constitutes an unreasonable and unjustifiable delay may be made." *Buxton*, 363 Md. at 645 (cleaned up). More than a simple

- 16 -

accounting of the days, weeks, or years passed since the events giving rise to the action, what matters to courts is the "reasonable diligence" (or lack thereof) demonstrated by the petitioner against whom the defense has been raised. *State Center*, 438 Md. at 610 (quoting *Hall v. Clagett*, 48 Md. 223, 243 (1878)). As the Supreme Court explained in *Holmberg v. Armbrecht*, 327 U.S. 392 (1946), "laches is not, like limitation, a mere matter of time; but principally a question of the inequity of permitting a claim to be enforced[.]" *Id.* at 396 (cleaned up).

What amounts to prejudice sufficient to sustain a laches defense is more straightforward: "*anything* that places [the party asserting the defense] in a less favorable position." *Buxton*, 363 Md. at 646 (emphasis added) (quoting *Parker*, 230 Md. at 130–31). Although establishing "some prejudice," *Akin v. Evans*, 221 Md. 125, 133 (1959), may not be a particularly high hurdle for the party raising the defense, a showing of prejudice is still an "essential element" of laches, *Salisbury Beauty Schools v. State Board of Cosmetologists*, 268 Md. 32, 63 (1973). Without prejudice, even when the party seeking relief has unreasonably delayed in asserting his or her rights, laches will not bar a purely equitable action. *Ademiluyi v. Egbuonu*, 466 Md. 80, 124 (2019); *see also Inlet Associates v. Assateague House Condominium Ass'n*, 313 Md. 413, 439 (1988) ("[M]ere delay in bringing an action is not sufficient to constitute laches if the delay has not worked a disadvantage to others.").

*3. The standard of review*

A circuit court's decision about whether the doctrine of laches bars a petition for coram nobis relief is an evaluative determination[9] involving the application of law to fact. *Cf. Anderson v. Great Bay Solar I, LLC*, 243 Md. App. 557, 611 (2019) ("[T]he question of whether laches has been established is a mixed question of fact and law."). We review without deference the court's conclusions about whether a delay in petitioning for relief was unreasonable and whether the unreasonable delay was prejudicial to the petitioner's opponent. *See Jones*, 445 Md. at 337 & n.12 (citing *State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 585 (2014)). To the extent that the appellant challenges the factual findings upon which these evaluative determinations are based, we review those findings for clear error. *Cunningham v. Feinberg*, 441 Md. 310, 322 (2015) ("Appellate courts accept and are bound by findings of fact in the lower court unless they are clearly erroneous." (cleaned up)). Whether the circuit court has applied the correct legal standard in its laches analysis is a question of law subject to *de novo* review. *State v. Robertson*, 463 Md. 342, 351 (2019) ("Errors of law and purely legal questions are reviewed *de novo* . . . .").

---

[9] We borrow this term from Randall H. Warner, *All Mixed Up About Mixed Questions*, 7 J. App. Prac. & Process 101, 119–21 (2005). The article provides a sort of taxonomy for the various "mixed questions of law and fact" confronted, in the first instance, by judges and juries, and reviewed with varying degrees of deference by appellate courts. *Id.* at 101. Warner describes "evaluative determinations" as "issues that—like negligence, probable cause, and reasonable suspicion—require a decision-maker to exercise judgment." *Id.* at 120. "Almost any time an issue uses words like 'reasonable' or 'fair,' it calls for an evaluative determination." *Id.*

*4. The challenged laches conclusions*

To determine whether the circuit court correctly concluded that the doctrine of laches barred Bodeau's petition for a writ of error coram nobis, we must answer two questions: Did the State prove, by a preponderance of the evidence, that Bodeau's delay in petitioning for coram nobis relief was unreasonable? If so, did the State prove, by a preponderance of the evidence, that it was prejudiced by this unreasonable delay? *See Liddy v. Lamone*, 398 Md. 233, 244 (2007) ("[L]aches 'applies when there is an unreasonable delay in the assertion of one's rights and that delay results in prejudice to the opposing party.'" (quoting *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 117 (2000)).

As we noted above, Bodeau contends that the court erred in accepting the State's laches defense because his delay in filing was not unreasonable and that, alternatively, the State has not proved it was prejudiced by any unreasonable delay. We consider each issue in turn.

*a. Unreasonable delay*

To determine whether a delay in seeking coram nobis relief is unreasonable, a court must first decide when that delay began. It must then ask when, if ever, that delay became unreasonable. *Cf. Jones*, 445 Md. at 344 ("In assessing whether the party unreasonably delayed before filing, the court first ascertains the length of the delay, then decides whether the delay was unreasonable. . . . Thus, a court's first task is to determine when the delay began.").

Outside the context of coram nobis petitions, courts assessing delay often ask when a particular claim—the claim against which the laches defense has been raised—accrued or

became "ripe." *See, e.g.*, *State Center, LLC v. Lexington Charles Ltd. Partnership*, 438 Md. 451, 590 (2014) ("In determining whether a delay is unreasonable, we must analyze [first] when, if ever, the claim became ripe . . . ."); *see also Lyons Partnership, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 798 (4th Cir. 2001) (delay begins when "the cause of action accrued"); *Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed. Cir. 1988) (delay is measured "from the date a cause of action first accrued"). "[T]he earliest time at which [the plaintiff is] able to bring [his] claim" is when the delay clock begins to run. *State Center*, 438 Md. at 590.

But in the coram nobis context, the clock may begin to run even before the petitioner can file a facially valid petition for coram nobis relief. This is the lesson of the Court of Appeals' decision in *Jones v. State*, 445 Md. 324 (2015), a case critical to our analysis.

On September 14, 1999, Corey Jones pleaded guilty in the Circuit Court for Baltimore City to one of the four drug-related offenses with which he had been charged. *Id.* at 330–32. After a hearing, the circuit court accepted this plea, convicted Jones, and sentenced him to six years of incarceration, with all but eighteen months suspended and with credit for time served, followed by three years of supervised probation. *Id.* at 332. Thirteen years later, in a federal district court, Jones pleaded guilty to being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). *Id.* at 333. Due in part to his 1999 conviction in the Circuit Court for Baltimore City, Jones stood to receive a mandatory minimum sentence of fifteen years' incarceration under the federal Armed Career Criminal Act, 18 U.S.C. § 924(e)(1). *Id.* Without the 1999 conviction, Jones would be subject to a maximum sentence of only ten years of incarceration under 18 U.S.C. § 924(a)(2). *Id.* For this reason,

on October 9, 2012, Jones filed a petition for a writ of error coram nobis seeking to invalidate the 1999 conviction. *Id.*

In his petition, Jones contended that his 1999 guilty plea in the Circuit Court for Baltimore City had been involuntary. *Id.* He claimed that "he had not been informed of the elements of the offense or nature of the charge to which he pled guilty" and that the transcript of the guilty-plea proceeding had "left unclear" which of the four charges he had actually pleaded guilty to. *Id.* Docket entries and certain statements made during the guilty-plea proceeding suggested that Jones was pleading guilty to use of a minor for the purpose of distributing heroin, but other statements made by Jones and his counsel suggested that his guilty plea was for possession of heroin with the intent to distribute. *Id.* at 330–32. In response to Jones's petition, the State contended that the doctrine of laches barred his petition to invalidate the thirteen-year old conviction—a losing argument in the circuit court but a winner in the Court of Special Appeals. *Id.* at 334 (citing *State v. Jones*, 220 Md. App. 238, 242 (2014)).

In challenging this Court's conclusion that laches barred his claim, Jones argued that any relevant "delay" could not have begun before he was able to file a facially valid coram nobis petition. *Id.* at 344. Measured from this moment, Jones's delay in seeking coram nobis relief was short-lived. When he filed his coram nobis petition on October 9, 2012, only *eleven weeks* had passed since he first faced "significant collateral consequences" from his 1999 conviction; it was not until July 23, 2012, that Jones pleaded guilty to being a felon in possession of a firearm in federal court and, as a result, stood to receive an enhanced sentence under 18 U.S.C. § 924(e)(1). *Id.* at 335. More significantly, Jones had

- 21 -

filed his petition only *eight days* after a change in state law made coram nobis a viable

mechanism for challenging his conviction; Jones had never applied for leave to appeal his

conviction, so before Md. Code, § 8-401 of the Criminal Procedure Article ("Crim.

Proc."),[10] became effective on October 1, 2012, Jones "may have been deemed to have

waived his right to file a coram nobis petition." *Id.* at 334–35.

The Court of Appeals rejected Jones's argument and held that "for the purposes of

determining whether the doctrine of laches bars coram nobis relief, delay begins when the

petitioner knew or should have known of the facts underlying the alleged error." *Id.* at 329.

The Court acknowledged that delay may begin later, however, if the legal error alleged in

the petition is "based on a case that had not yet been decided or a statute that had not yet

been enacted" at the time the error was made. *Id.* at 356 (citing *Telink, Inc. v. United States*,

24 F.3d 42, 46 (9th Cir. 1994)).

Several significant considerations supported the Court's decision to start the delay

clock when the alleged error first becomes clear rather than when a coram nobis claim first

may be brought. First, a coram nobis petition is premised on some error made at the trial

(or guilty-plea proceeding) that produced a criminal conviction. As that error becomes

---

[10] Crim. Proc. § 8-401 provides: "The failure to seek an appeal in a criminal case may not be construed as a waiver of the right to file a petition for writ of error coram nobis."). The statute superseded the Court of Appeals' decision in *Holmes v. State*, 401 Md. 429, 431 (2007), in which the Court held that "a presumption that an individual waives his right to file a petition for a writ of error coram nobis arises if the individual, after entering a guilty plea and having been informed of his right to file an application for leave to appeal, does not file an application for leave to appeal." *See Jones*, 445 Md. at 335 & n.11.

more remote in time, "memories . . . fade and evidence . . . disappears," impairing "both the State's ability to defend against the allegation of error and the State's ability to reprosecute" the petitioner should a new trial be awarded. *Id.* at 345. Second, from the moment the error is made until even after his release from confinement, parole, and probation, a criminal defendant may have multiple opportunities to bring the alleged error to the court's attention. *See id.* at 356–57 (noting the many ways that Jones could have raised the alleged error before he was able to bring a facially valid petition for coram nobis relief). The petitioner's failure to seize earlier opportunities to raise the error—and any apparent motivations for this inaction—may fairly be factored into conclusions about whether the petitioner has unreasonably delayed in asserting his rights. *Id.* at 346–47. Ultimately, the Court explained, "what matters is *when* the petitioner raises the allegation of error, not *how* the petitioner raises the allegation of error." *Id.* at 349 (emphasis in original).

Applying the delay-calculation rule laid out in its analysis, the Court of Appeals concluded that Jones's delay in raising his alleged error and asserting his due-process rights began at the moment he entered the allegedly involuntary guilty plea. This was some thirteen years before he filed (or even *could* file) his petition for coram nobis relief.

In Bodeau's case, the facts underlying the error alleged in his coram nobis petition would have been known when the advisory-only instructions were given at his 1971 daytime-burglary trial. But, unlike in *Jones*, Bodeau's allegation of error—that the court's advisory-only instructions violated his due-process rights—was based on a case that had not yet been decided at the time the daytime-burglary jury was instructed. It wasn't until

- 23 -

1981 that the Court of Appeals held that advisory-only instructions similar to those given

at Bodeau's 1971 trial amounted to reversible error. *See Montgomery v. State*, 292 Md. 84,

91 (1981) (holding that the trial court erred in telling the jury that its instructions on the

law were "advisory" and that the jury "could pay no attention" to them).[11] This means that

---

[11] The year before it decided *Montgomery*, the Court of Appeals suggested in *Stevenson v. State*, 289 Md. 167 (1980), that juries in criminal trials "should not be informed that *all* of the court's instructions are merely advisory" and instead "should be informed that the judge's charge with regard to . . . legal matter[s outside the 'law of the crime' and the 'legal effect of the evidence' are] binding and may not be disregarded." *Id.* at 180 (emphasis added). But this language must be read in light of the narrow issue apparently before the Court in *Stevenson*: deciding "whether Article 23 [of the Maryland Declaration of Rights,] which, as interpreted by [the] Court, requires that jury instructions on the law be advisory only, is itself violative of the United States Constitution." *Id.* at 172–73. After concluding that Article 23's "Judges of Law" language empowered the jury to do nothing more than "resolv[e] conflicting interpretations of the law of the crime and . . . decid[e] whether that law should be applied in dubious factual situations," *id.* at 179 (cleaned up), the Court held that Article 23 was not unconstitutional on its face. According to the Court's opinion, Article 23 passes constitutional muster because it does not impermissibly allocate law-judging functions between judge and jury, and it doesn't authorize juries to disregard bedrock legal principles, like the presumption of innocence or the prohibition on drawing inferences from a defendant's silence. *Id.* at 187–88.

As the Court of Appeals explained in *State v. Adams-Bey*, 449 Md. 690 (2016), it was not until the following year, in *Montgomery*, that the Court actually "subscribed to [the *Stevenson*] standard" and held for the first time that "the trial court erred in advising the jury that *all* of the court's instructions were advisory." *Id.* at 694–95 (emphasis in original).

As we note later in our analysis, the Court of Appeals, for decades, did not consider itself to be making any new law in *Stevenson* or *Montgomery*. *See State v. Adams*, 406 Md. 240, 258–59 (2008) (explaining that "*Stevenson* did not announce a new rule" and instead "purported to explain and continue the reasoning of prior decisions," while "*Montgomery* merely served as an example and application of *Stevenson*"). This view of the legal significance of the decisions in *Stevenson* and *Montgomery* changed completely in *Unger v. State*, 427 Md. 383, 411 (2012) ("[T]he *Stevenson* and *Montgomery* opinions set forth a new interpretation of Article 23 and established a new state constitutional standard.").

Bodeau's delay in asserting his rights began in 1981, with the decision in *Montgomery*, some thirty-eight years before Bodeau sought coram nobis relief.

Thirty-eight years is a long time. But the length of the delay in asserting one's rights is not the only factor to be considered in assessing the delay's reasonableness. *Cf. Spaw, LCC v. City of Annapolis*, 452 Md. 314, 360 (2017) ("Laches is an inequitable defense asserting an inexcusable delay by the suitor in asserting its right *without necessary reference to duration*." (emphasis added)). Courts may also consider "the reason for the delay, the incentive to challenge the prior conviction, and the basis for the coram nobis petition." *Jones*, 445 Md. at 356–57. Additionally, the failure to take advantage of earlier opportunities to raise the issue might render delay unreasonable, if an incentive to do so then existed or if inaction was purposeful. *Id.*; *cf. Telink*, 24 F.3d at 48 (holding that a federal district court did not abuse its discretion in applying laches to bar a coram nobis petition because the petitioners could have raised the error, once it was identified in case law by the Supreme Court, in earlier proceedings for post-conviction relief).

Above all, it was this failure to seize earlier opportunities to raise the issue that rendered the petitioner's thirteen-year delay unreasonable in *Jones*. The Court noted that an incentive to challenge his conviction existed from the moment the circuit accepted Jones's guilty plea and handed down his sentence; six years later, when the court sentenced Jones to another three years' incarceration for violating his probation order, that incentive was renewed. *Jones*, 445 Md. at 357. And still, even with mechanisms available to raise the error and challenge his conviction from the very beginning, Jones did nothing:

> Jones failed to move to withdraw his guilty plea (which he had ten days to do, *see* Md. Rule 4-242(h)), move for a new trial (which he had ten days to do, *see* Md. Rule 4-331(a)), apply for leave to appeal (which he had thirty days to do, *see* Md. Rule 8-204(b)(2)(A)), move to set aside an unjust or improper verdict (which he had ninety days to do, *see* Md. Rule 4-331(b)(1)(B)), or petition for post-conviction relief (which he had nine years to do, *see* Crim. Proc. § 7-103(b)) . . . .

*Id.* at 356 (cleaned up). Jones waited until 2012 to challenge the 1999 conviction—only after he had committed another crime and, as a consequence of the old conviction, stood to receive an enhanced sentence. *Id.* at 357. Jones did not speak up sooner simply because he had wanted to receive the benefit of a favorable plea agreement. *Id.* at 347.

The case before us is different from *Jones*. By the time the error in the advisory-only instructions from Bodeau's daytime-burglary trial became clear in 1981, Bodeau had fully served his sentence for that conviction. Free from confinement, parole, and probation, Bodeau had no incentive to raise the error. And even if an incentive had existed, Bodeau had no apparent means by which to make his challenge. Unlike in *Jones*, the deadlines for Bodeau to move for a new trial, to move to set aside the verdict, and to appeal his conviction had long passed. And Bodeau could not petition for post-conviction relief either. *See State v. McMannis*, 65 Md. App. 705, 708 (1986) (holding that once a person is "no longer in prison, on parole, or on probation for a conviction," he may not use post-conviction review to challenge that conviction).

Coram nobis relief was also unavailable to Bodeau at the time—and would remain unavailable for more than two decades, until a series of changes in Bodeau's circumstances and the applicable case law made a coram nobis petition a viable mechanism for raising the issue. Bodeau's first obstacle to obtaining coram nobis relief was the fact that he was

not suffering any significant collateral consequences from his 1971 conviction until at least 1989, when he was convicted of armed robbery and received a mandatory life-without-parole sentence. This sentence was predicated, in part, on the 1971 daytime-burglary conviction.[12] It is not clear whether significant collateral consequences were a precondition to obtaining coram nobis relief in Maryland before 2000. *See Skok v. State*, 361 Md. 52, 79 (2000) (citing no Maryland case for the proposition that "the coram nobis petitioner must be suffering or facing significant collateral consequences from the conviction"). But without any such consequence, Bodeau lacked any incentive to raise the error from his 1971 trial. We therefore cannot say that Bodeau's delay in challenging the advisory-only instructions was unreasonable before this point.

Bodeau's second obstacle to obtaining coram nobis relief was the nature of the circuit court's alleged error in giving the advisory-only instruction. Even by 1989, when Bodeau finally had an incentive to raise the error, the scope of coram nobis relief did not extend beyond addressing "errors of fact" not litigated at trial but nonetheless "material to the validity and regularity of the proceedings." *Skok*, 361 Md. at 67 (quoting *Madison v. State*, 205 Md. 425, 432 (1954)). The error Bodeau would eventually allege—the improper advisory-only instructions—was an error of law. The scope of coram nobis relief was broadened in 2000 by the Court of Appeals' decision in *Skok v. State*, 361 Md. 52. Adopting

---

[12] As we note in Part B of our analysis, the State contests whether Bodeau's mandatory life-without-parole sentence is a significant collateral consequence of the 1971 conviction because, the State says, there were additional qualifying convictions that would have supported imposition of a mandatory life sentence under Maryland's four-strikes law even without the 1971 conviction.

the reasoning of the Supreme Court in *United States v. Morgan*, 346 U.S. 502 (1954), and other state supreme courts, the Court held that coram nobis petitions could be used to challenge "not only errors of fact that affect the validity or regularity of legal proceedings, but also legal errors of a constitutional or fundamental proportion." *Skok*, 361 Md. at 75 (quoting 3 Charles A. Wright, *Federal Practice and Procedure* § 592 (2d ed. 1982)). With this expansion, the alleged instructional error from Bodeau's 1971 trial was at least the type of error that could be raised in a petition for coram nobis relief. But before this point, Bodeau's delay in raising the issue in a coram nobis proceeding could not have been unreasonable.

The Court's expansion of the writ in *Skok* was "subject to several important qualifications," *id.* at 78, one of which was the third obstacle preventing Bodeau from obtaining coram nobis relief. According to the Court in *Skok*, "[b]asic principles of waiver," drawn from the body of law "applicable under the Maryland Post Conviction Procedure Act," would apply to the issues raised in a coram nobis petition. *Id.* at 79. Bodeau had not objected to the advisory-only instructions at his trial, and he did not raise the issue in any direct appeal following his conviction. This meant that, at least at the time *Skok* was decided and for several years thereafter, any coram nobis petition filed by Bodeau would have been flatly rejected on waiver grounds. *See State v. Adams*, 406 Md. 240 (2008) (concluding that appellant had waived a post-conviction challenge to improper advisory-only instructions by not objecting to the instructions at trial or raising the issue on direct appeal); *see also Walker v. State*, 343 Md. 629, 645 (1996) ("[T]he failure to object to a

jury instruction ordinarily constitutes a waiver of any later claim that the instruction was erroneous.").

This third and final obstacle was overcome with the Court of Appeals' tide-turning decision in *Unger v. State*, 427 Md. 383 (2012). Overruling decades of case law, the Court held that a failure to object to advisory-only instructions in criminal trials before *Stevenson v. State*, 289 Md. 167 (1980), "w[ould] not constitute a waiver" of a challenge to those instructions in a proceeding under Maryland's Post Conviction Procedure Act. *Unger*, 427 Md. at 391.[13] The same rule would apply in the coram nobis context, s*ee Skok*, 361 Md. at 79 ("[T]he same body of law concerning waiver and final litigation of an issue, which is applicable under the Maryland Post Conviction Procedure Act, shall be applicable to a coram nobis proceeding challenging a criminal conviction." (cleaned up)), which meant that Bodeau finally had a facially valid claim for coram nobis relief.[14]

---

[13] The developments that led to the Court's decision in *Unger* and the Court's reasoning therein are well explained in other opinions by this Court and the Court of Appeals. *See, e.g.*, *State v. Adams-Bey*, 449 Md. 690, 694–96 (2016); *State v. Waine*, 444 Md. 692, 695–96 (2015); *Unger*, 427 Md. at 387–91, 411–18; *Calhoun-El v. State*, 231 Md. App. 285, 291–96 (2016). The details of this evolution are not important to our analysis. All that matters is that Bodeau's failure to have objected to the advisory-only instructions given at his 1971 trial would have been an impediment to obtaining coram nobis relief until the Court of Appeals decided *Unger*. *See Waine*, 444 Md. at 696 ("The *Unger* decision effectively opened the door to postconviction relief for persons tried during the era of the advisory only jury instruction—an opportunity that had been foreclosed by *Stevenson*, *Montgomery*, and *Adams*.")

[14] At least arguably, it might have been reasonable for someone in Bodeau's position to delay bringing a coram nobis claim even after *Unger* was decided. In *State v. Waine*, 444 Md. 692 (2015), the Court of Appeals held that the giving of improper advisory-only instructions amounted to "structural error not susceptible to harmless error analysis,"

In short, Bodeau's delay in challenging the advisory-only instructions from his 1971 trial began in 1981 when the Court of Appeals made the error clear in *Montgomery*. That delay was *reasonable* until at least 2012, when Bodeau was facing significant collateral consequences from the 1971 conviction; when the scope of coram nobis had been expanded to encompass legal errors like the circuit court's allegedly improper advisory-only instructions; and when, finally, under *Unger*, Bodeau's failure to have objected to those instructions at trial no longer precluded him from seeking coram nobis relief. Bodeau's delay in raising the issue before he had both an incentive and a viable mechanism to do so should not be held against him. There is nothing equitable about penalizing a litigant who chooses not to clutter the circuit court's docket with a petition that is doomed to failure.

At some point thereafter, however, we think Bodeau's delay became unreasonable. Almost seven years passed between the Court's decision in *Unger* and the time that Bodeau filed his coram nobis petition. We know that Bodeau is not a lawyer; we do not assume that he reads the opinions of our appellate courts the day they are published. But to avoid a laches problem, coram nobis petitioners must show reasonable diligence in asserting their rights. We do not think Bodeau satisfied this requirement by sitting on a facially valid claim for coram nobis relief for seven years.

---

requiring the vacatur of a conviction in an action for post-conviction relief. *Id.* at 705. Bodeau does not make this argument, and we will not address it.

Based on the record before us, we are not sure that we can fairly decide exactly when Bodeau's post-*Unger* delay in filing became unreasonable.[15] In his case, however, we need not decide how long was too long. For the reasons we outline in the next section of our analysis, the State did not make a showing of prejudice sufficient to sustain its laches defense, even if we assume that Bodeau's unreasonable delay began the day *Unger* was filed.

### b. Prejudice to the State

As we explained above, prejudice is an "essential element" of a laches defense. *Salisbury Beauty Schools v. State Board of Cosmetologists*, 268 Md. 32, 63 (1973). In the context of a coram nobis petition, "prejudice involves not only the State's ability to defend against the coram nobis petition, but also the State's ability to reprosecute." *Jones*, 445 Md. at 357. The State need not establish that reprosecution would be "impossible." *Id.* at 360. Instead, the State must simply show that the petitioner's unreasonable delay "places the State in a less favorable position for purposes of reprosecuting the petitioner." *Id.* (cleaned up).

---

[15] At oral argument, counsel for Bodeau suggested that in deciding whether his delay in filing was reasonable, we should consider that it took some time for the Office of the Public Defender to identify clients, like Bodeau, with arguments made actionable as a result of *Unger*. We decline to do so because the issue was not presented to the circuit court. (Nor was it briefed.)

We are aware that public defenders bear heavy caseloads, and many of their cases involve deadlines that may be more urgent and rigid than those for coram nobis relief. But our decision must be based on the record before us and not what we know—or think we know—about that agency's workload and resources.

The State has identified several ways in which its ability to reprosecute Bodeau has been hampered. A key eyewitness from Bodeau's 1971 trial has died, and the homeowner–victim, ninety-four years old at the time of the May 2019 hearing before the circuit court, has no memory of the events surrounding the burglary. *Cf. id.* ("It is difficult to imagine anything more prejudicial than the circumstance that the State's only eyewitness can no longer testify about what the eyewitness saw."). A trial transcript exists, but this would be a poor substitute for live witness testimony. *Cf. id.* at 361 ("[T]he State would . . . be prejudiced by being forced to rely on a document instead of testimony—which would have constituted more compelling evidence."). The original court file for the case has been destroyed, and neither the State's Attorney nor the police department who investigated the burglary still has a file on the case. All physical evidence that would have been stored with these files is also unavailable.[16]

But the State did not establish that it occupies this "less favorable position" *as a result of Bodeau's unreasonable delay* in asserting his rights. *See Frederick Road*, 360 Md. at 117 ("[L]aches . . . applies when . . . an *unreasonable delay* in the assertion of one's rights . . . *results in prejudice* to the opposing party." (emphasis added)). As we said in the previous section of our analysis, Bodeau's delay in asserting his rights could not have been

---

[16] At the hearing before the circuit court, the State also noted that it had not yet made contact with the detective who investigated the case. The State told the circuit court nothing about an attempt to contact Bodeau's co-defendant, who also testified at Bodeau's 1971 trial. From these facts, we cannot conclude that these witnesses would be unavailable at a new trial, prejudicing the State. The status of these witnesses apparently did not factor into the circuit court's prejudice conclusions either.

unreasonable until, at the earliest, the Court of Appeals decided *Unger* on May 24, 2012. The neighbor–witness who testified at Bodeau's 1971 trial died in 2003, and the original court file for the case was destroyed in 2006. Both of these things occurred before Bodeau's unreasonable delay in asserting his rights began. The State put on no evidence as to when its own case files or those of the investigating police department disappeared. For all we know, these files would have been unavailable even if Bodeau had filed his claim the day *Unger* was decided—or even a decade before. Nor did the State establish the unavailability of two other critical witnesses: the co-defendant who testified against Bodeau and the now retired Montgomery County Police detective who had handled the case. The State similarly failed to put on any evidence to suggest that the ninety-four-year-old homeowner–victim only recently lost his memory of the events surrounding the 1970 burglary. By 2012, the homeowner–victim was already eighty-seven years old, and four decades had passed since the crime was committed. It is generally acknowledged that memories fade over time, but we cannot agree that this kind of inevitable incremental deterioration of evidence is enough to satisfy the prejudice requirement for laches. Otherwise, the fact of delay itself would be sufficient to establish prejudice. Something more is required.

Because the State has not established by a preponderance of the evidence that it has been prejudiced by Bodeau's unreasonable delay, its laches defense must fail. In reaching this conclusion, we do not endorse Bodeau's argument that the State, to establish prejudice, would have to "pinpoint what 'important information' was lost" when the original court and prosecution files for the case were destroyed. We do not see how prosecutors handling a case from nearly fifty years ago would be able to "pinpoint" information now missing

from a file that they, in all likelihood, have never seen before. Nor do we endorse Bodeau's argument that the State cannot establish prejudice without showing a "compelling interest" in retrying him to ensure that his life-without-parole sentence remained intact. Bodeau offers no legal authority to support this proposition, so we need not address it.

### 5. *Bodeau's add-on arguments*

In addition to his arguments about unreasonable delay and prejudice, Bodeau suggests in his briefs that "the merits of [his] coram nobis petition also strongly weigh against applying the doctrine of laches." He emphasizes that the instructional error alleged was structural—not subject to harmless-error analysis—and "of the sort that will always invalidate the conviction," *State v. Adams-Bey*, 449 Md. 690, 708 (2016)—at least in post-conviction proceedings. He notes that if he were still serving his sentence for daytime burglary, he would undoubtedly be entitled to a new trial through post-conviction-relief proceedings. Fairness, Bodeau maintains, requires that Bodeau receive the same relief in the coram nobis context.

As we understand these arguments, Bodeau essentially maintains that when an alleged error is especially egregious and could be addressed in proceedings for post-conviction relief, the equitable defense of laches should not bar a petition for a writ of error coram nobis. Bodeau does not offer any support for this fairness-based add-on to the conventional two-pronged laches inquiry. Because it is not our job to find support for him, we will not address this argument. *See HNS Development, LLC v. People's Counsel for Baltimore County*, 425 Md. 436, 459 (2012).

## B. Reaching the merits of Bodeau's petition

Bodeau also argues that if we conclude that the State's laches defense fails, then we "may reach the merits of [his] coram nobis petition without remanding the case to the circuit court for further consideration." "Everything this Court needs to know to address the merits is available in the record," he says. That the circuit court gave an erroneous advisory-only instruction is clear from the trial transcript, he argues. "Without a shadow of a doubt, [that] instruction was improper under *Stevenson*, *Montgomery*, and *Unger*" and "indisputably constituted structural error under *Waine* and *Adams-Bey*." Bodeau says that the State "did not even attempt to challenge" his petition on its merits before the circuit court.

The State responds that "the legality of the [advisory-only] jury instruction is not the only issue in determining whether the issuance of the writ would be warranted." A remand to the circuit court is necessary, the State says, "to determine whether Bodeau is suffering significant collateral consequences from his [1971] conviction[] and whether granting the extraordinary writ of error coram nobis will achieve justice."

In his reply brief, Bodeau argues that there was no "genuine dispute" before the circuit court as to whether Bodeau is suffering a significant collateral consequence from his 1971 conviction and that, accordingly, the State has "abandoned" any argument on that score. In response to the State's interests-of-justice argument, Bodeau argues, in effect, that the circuit court would be all but required to reach the conclusion that issuing the writ would be in the interests of justice in this case: "[I]f the giving of an 'advisory only' instruction

constitutes structural error requiring reversal of convictions in the post-conviction context, it is difficult to fathom why it would not demand reversal in the coram nobis context too."

We agree with the State that the case should be remanded to the circuit court. To obtain coram nobis relief, a petitioner must establish, among other things, that he "faces significant collateral consequences from the [challenged] conviction." *Jones v. State*, 445 Md. 324, 338 (2015) (cleaned up). An enhanced sentence predicated in part on the challenged conviction may qualify as a significant collateral consequence. *Parker v. State*, 160 Md. App. 672, 687–88 (2005). But if the petitioner would have received the enhanced sentence even without the challenged conviction, he may not be suffering a significant collateral consequence. *See id.* at 688.

In this case, there is clearly a factual dispute between the parties about whether Bodeau would still have been eligible for a life-without-parole sentence in 1989 if he had not been convicted of daytime-burglary in 1971. This factual dispute was generated by the State in its answer to Bodeau's petition, and it was not resolved before the circuit court. We decline the invitation to engage in any exercise of appellate fact-finding; the circuit court is entitled to take the first shot. *See Hartford Fire Insurance Company v. Estate of Sanders*, 232 Md. App. 24, 39 (2017) ("Appellate courts do not make factual findings . . . .").

Even in the absence of a factual dispute about whether Bodeau is suffering a significant collateral consequence from his 1971 daytime-burglary conviction, it would still be inappropriate for this Court to attempt to resolve the merits of the petition. As the Court of Appeals has recently explained, "coram nobis relief is an extraordinary remedy that should be allowed only under circumstances compelling such action to achieve justice." *State v.*

*Rich*, 454 Md. 448, 470 (2017) (cleaned up). Even when a petitioner satisfies the preconditions to obtaining coram nobis relief, the decision whether to grant this "extraordinary" remedy ultimately resides in the circuit court's sound discretion. *Franklin v. State*, ___ Md. ___, No. 57, 2019 Term, slip op. at 12, 2020 WL 4696779, at \*6 (filed August 13, 2020). It is the circuit court which decides, in the first instance, whether the circumstances of the particular case compel the issuance of a writ of error coram nobis "to achieve justice." Our task is to *review* the circuit court's exercise of this discretion for abuse—not to *exercise* that discretion on the circuit court's behalf.

## C. The State's add-on argument

Juxtaposed to its argument that this Court cannot appropriately resolve the merits of Bodeau's petition, the State contends that even if Bodeau would not have received an enhanced sentence without the 1971 conviction for daytime burglary, he is ineligible for coram nobis relief because he is not "suddenly" facing a significant collateral consequence. We do not view this as a basis for remanding the case to the circuit court but rather as a separate and independent basis by which to affirm the circuit court's judgment—an argument that Bodeau's coram nobis petition could not succeed on its merits, rendering remand unnecessary.

The State roots its argument in language from the Court of Appeals' opinion in *Skok v. State*, 361 Md. 52 (2000), in which the Court reasoned that "there should be a remedy for a convicted person who is not incarcerated and not on parole or probation, who is *suddenly* faced with a significant collateral consequence of his or her conviction, and who can legitimately challenge the conviction on constitutional or fundamental grounds." *Id.* at

78 (emphasis added). In our view, the State places an undue amount of weight on the word "suddenly," contending that to qualify for coram nobis relief, Bodeau must show that his enhanced sentence was a "sudden and unexpected collateral consequence" of his 1971 conviction and that he cannot make this showing for two reasons.

First, the State says that because the possibility of a sentencing enhancement arose from "criminal conduct fully within Bodeau's control" and "should have been plain the moment he committed the crime for which he was convicted in 1989," he is not "suddenly" facing a significant collateral consequence from an earlier conviction because the consequence was a foreseeable result of later criminal conduct. Accepting this argument would necessarily lead to the conclusion that *anyone* who has received an enhanced sentence is ineligible for coram nobis relief because the possibility of sentence enhancement is *always* "plain" the moment someone knowingly engages in criminal conduct after receiving an earlier conviction. This conclusion is untenable. One of the principal reasons why the Court of Appeals expanded the scope of coram nobis relief in *Skok* was because "serious collateral consequences of criminal convictions ha[d] become much more frequent in recent years," due in part to "a proliferation of recidivist statutes throughout the country." 361 Md. at 77.

Second, the State says, Bodeau has been serving his life-without-parole sentence for thirty years now; Bodeau isn't "suddenly" facing a significant collateral consequence of his 1971 conviction because the novelty of his life-without-parole sentence has long since faded. This argument ignores the fact that a petitioner may suffer from the collateral consequences of a conviction years before he has a viable mechanism to challenge that

- 38 -

conviction. The circumstances of Bodeau's case, explained in our laches analysis, make this clear.

Simply put, the State has tried to read into *Skok* a requirement for coram nobis relief not contemplated by our courts. A petitioner for coram nobis relief "suddenly" faces significant collateral consequences simply because that consequence was not known to him at the time of conviction. *See id.* at 77 ("Very often in a criminal case, because of a relatively light sanction imposed or for some other reason, a defendant is willing to forego an appeal even if errors of a constitutional or fundamental nature may have occurred. Then, when the defendant later learns of a substantial collateral consequence of the conviction, it may be too late to appeal, and, if the defendant is not incarcerated or on parole or probation, he or she will not be able to challenge the conviction by a petition for a writ of habeas corpus or a petition under the Post Conviction Procedure Act." (cleaned up)); *see also Peterson v. State*, 467 Md. 713, 734 (2020) (explaining that a "collateral consequence" is one that was "excluded from the court's judgment" in the earlier criminal case and that was "not a definite, practical consequence of the conviction" (cleaned up)); *Vaughn v. State*, 232 Md. App. 421 (2017) ("[W]e know of [no case] where any appellate court in this State has held that a petitioner for *coram nobis* relief meets the 'significant collateral consequence' requirement by pointing to a consequence of the guilty plea that the petitioner *knew about on the day he pled guilty*." (emphasis in original)).

**Conclusion**

As historian David Blight has put it, "Context and timing are often all." David W. Blight, *Frederick Douglass: Prophet of Freedom* xv (2018). This is certainly so when a party seeks to assert the equitable defense of laches to bar a petition for a writ of error coram nobis. Bodeau's decades-long delay in challenging the advisory-only instructions from his 1971 trial was substantial. But, viewed in context, that delay became unreasonable only after the Court of Appeals' decision in *Unger v. State*, 427 Md. 383 (2012). Because the State has not shown any prejudice arising after the point at which Bodeau's delay became unreasonable, the State's laches defense must fail. The circuit court erred in reaching a contrary conclusion. We will remand this case to the circuit court so that it can address the merits of Bodeau's coram nobis petition.

> **THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY IS REVERSED AND THIS CASE IS REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO PAID BY MONTGOMERY COUNTY.**